JOHN GURRY, JR., & another,[1] administrators,[2] vs.
CUMBERLAND FARMS, INC.

Plymouth. October 4, 1989. - February 12, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Corporation*, Merger, Corporate successor liability, Corporate entity.
*Workmen's Compensation Act*, Action against employer. *Agency*,
"Loaned servant." *Joint Enterprise. Practice, Civil*, Summary judg-
ment. *Words*, "Liabilities," "Joint venture," "Single employer."

In a wrongful death action against a corporate employer arising from the
death of its employee on the job due to the alleged negligence of the
defendant's corporate predecessors prior to their merger into the de-
fendant, summary judgment should not have been granted in favor of
the defendant under § 24 of G. L. c. 152, the workers' compensation
act, for any liability which the defendant, as the surviving corporation,
assumed as a result of the merger of the predecessor corporations. [619-
621]

In a wrongful death action against a corporate employer arising from the
death of its employee on the job due to the alleged negligence of the
defendant's two corporate predecessors prior to their merger into the
defendant, summary judgment in favor of the defendant was inappro-
priate on the theory that the negligence of an employee of one of its
corporate predecessors, in designing and manufacturing a piece of
equipment, caused the decedent's death and that the workers' compen-
sation immunity inherited from the predecessor as a result of the
merger absolved the defendant from liability, where materials before
the judge showed genuine factual issues as to whether the predecessor's
employee was a "loaned servant" in connection with the design and
manufacture of the equipment, and whether the two predecessors were
engaged in a "joint venture" so as to constitute a single employer for
the purpose of G. L. c. 152. [622-625]

In a wrongful death action against a corporate employer arising from the
death of its employee on the job due to the alleged negligence of the
defendant's corporate predecessors prior to their merger into the de-
fendant, there was no basis for disregarding the predecessor corpora-.

[1]Walter Gurry.
[2]Of the estate of Kevin Gurry.

tions' separate identities so as to conclude that they constituted a "single employer" for the purpose of providing the defendant with the workers' compensation defense one of the predecessors would have had under G. L. c. 152, § 24. [625-626]

CIVIL ACTION commenced in the Superior Court Department on August 22, 1986.

The case was heard by *Chris Byron*, J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Michael Avery* (*Francis Marini* with him) for the plaintiffs.

*DeLane E. Anderson, Jr.*, for the defendant.

LYNCH, J. The plaintiffs brought this wrongful death action under G. L. c. 229, § 2 (1988 ed.), on the basis of a claim that the negligent design, manufacture and maintenance of a machine by two predecessor corporations of the defendant Cumberland Farms, Inc. (Cumberland), caused Kevin Gurry's death. As a result of the merger of the alleged tortfeasors, only one of which had employed Kevin Gurry, into the new entity, Cumberland, the plaintiffs argue that Cumberland succeeds to their liabilities. G. L. c. 156B, § 80 (*b*) (1988 ed.). A Superior Court judge granted the defendant's motion for summary judgment, Mass. R. Civ. P. 56 (b), 365 Mass. 824 (1974). We allowed the plaintiffs' application for direct appellate review, and now reverse.

The following undisputed facts were before the judge when he granted summary judgment. Kevin Gurry was killed on the job on January 11, 1985, while operating a sanding "buggy" on a cranberry bog owned and operated by the defendant, Cumberland, his employer at the time. The sanding buggy in which Kevin Gurry was killed was one of several constructed around 1983 for the company which then owned and operated the Hanson bog, United Cranberry Growers Associates, Inc. (Cranberry Growers). Cranberry Growers, a Massachusetts corporation, was a wholly-owned subsidiary of

Delaware Food Store, Inc., a Delaware holding company. One of Cranberry Growers' sibling subsidiaries was Cumberland Farms Dairy, Inc. (Dairy), a Rhode Island corporation primarily in the business of operating dairy farms and bread bakeries. However, as another part of its function, Dairy provided, for a regularly billed fee, administrative and managerial services to a number of fellow Delaware Food Store subsidiaries, including Cranberry Growers. It was Dairy's vice president of operations, John Peck, who commissioned a local craftsman, William P. O'Donnell, to build the sanding buggies for Cranberry Growers' cranberry bog business in 1983.

Peck selected O'Donnell, communicated with him about the design of the buggy, and gave him a model to follow. No one else directed or had contact with O'Donnell on the buggy construction project. Cranberry Growers paid O'Donnell and supplied him with materials. Peck continued to draw his salary from Dairy and no other source. In its next routine "administration fee" payment to Dairy, Cranberry Growers covered the management services rendered by Peck and other Dairy corporate executives, as well as record keeping services. The payment did not itemize or distinguish the portion that went for Peck's work on the sanding buggy project, as opposed to his and other executives' services on other jobs.

In general, the interrelationship among those corporations existing at the time of the sanding buggy's design and manufacture was rather complex. Essentially, the products of Cranberry Growers and Dairy were sold to the public through the chain of "Cumberland Farms" convenience stores, operated by yet other Delaware Food Store subsidiaries.

The eight or nine sanding buggies built by O'Donnell had been in use for one season when Kevin Gurry was hired to work for Cranberry Growers on March 6, 1984. He continued to be employed by that entity until September 30, 1984. On that day, in accordance with a plan for corporate reorganization, both Cranberry Growers and Dairy merged into Delaware Food Store, which in turn merged into Cumberland, a Delaware corporation created just two weeks earlier.

The sanding buggy was owned by Cranberry Growers until that company ceased to exist. Kevin Gurry continued at his job, now employed by Cumberland, until he died on January 11, 1985, on his first morning back at work after having been laid off. Kevin Gurry had never been employed by Dairy.

Cranberry Growers and Dairy, along with thirty-five "owned or controlled subsidiary entities" and shareholders owning fifty percent or more of the Cumberland Farms-Haseotes family related corporations,[3] were named insureds on a single workers' compensation insurance policy. Payments in accordance with G. L. c. 152, § 65, were made by this insurance carrier to the entitled beneficiaries shortly after Kevin Gurry's death.

The plaintiffs originally named Dairy and Cranberry Growers as defendants. After a motion to dismiss was allowed because those entities had ceased to exist, the plaintiffs amended their complaint to name Cumberland.

In its motion for summary judgment, Cumberland raised a number of arguments as to why the workers' compensation statute barred the plaintiffs' suit. First, Cumberland argued that because it was Kevin Gurry's employer at the time of his accident, it is immune from suit under G. L. c. 152, § 24, for the death that resulted in the course of that employment. In the alternative, Cumberland asserted that, as a successor to Cranberry Growers, it acquired the workers' compensation defense Cranberry Growers would have had. Accordingly, Cumberland states (1) because Peck was a loaned servant of Cranberry Growers at the time of the alleged negligence; or (2) because Cranberry Growers and Dairy were a "single insured employer" under G. L. c. 152, § 1 (5), the plaintiffs remain barred by c. 152. The plaintiffs opposed this motion and moved for partial summary judgment. In order for summary judgment in favor of the defendant to be correct, Cumberland must be without liability in its own right as the em-

---

[3]All the "Cumberland Farms" operations were owned and controlled primarily by the Haseotes family. Demetrios Haseotes primarily served as chief executive officer and chairman of the board of both Cranberry Growers and Dairy.

ployer of the decedent, or it must have acquired immunity from Cranberry Growers or Dairy as a result of the mergers. We examine each of those theories.

1. *Corporate successor liability for workplace accidents.* Liability to an employee injured on the job as a result of negligence of the employer's corporate predecessors raises a question of law that no Massachusetts court has previously addressed. The answer depends on the interrelationship of two statutes: the business corporation law, G. L. c. 156B,[4] and the workers' compensation act, c. 152.

Under G. L. c. 156B, § 80 (*b*), the effect of a merger is that the "resulting or surviving corporation shall be deemed to have assumed, and shall be liable for, all liabilities and obligations of each of the constituent corporations in the same manner and to the same extent as if such resulting or surviving corporation had itself incurred such liabilities or obligations." By the same token, under § 80 (*a*) (5), the new corporation that results from a merger also inherits "all of the estate, property, rights, privileges, powers and franchises of the constituent corporations . . . ." This court has repeatedly construed the word "liabilities" broadly, "to express obligations sounding in contract or tort," and "undoubtedly" reaching "contingent obligations." *Boston Elevated Ry.* v. *Metropolitan Transit Auth.*, 323 Mass. 562, 568 (1949). See *Xtra Inc.* v. *Commissioner of Revenue*, 380 Mass. 277, 280 (1980); *Rose-Derry Corp.* v. *Proctor & Schwartz, Inc.*, 288 Mass. 332, 338 (1934). Encompassed within the meaning of the word "privilege," on the other hand, is an immunity or exemption, created by the law for a particular class or purpose, from liability that would otherwise exist in those gen-

---

[4]The defendant Cumberland contends that Delaware law, not Massachusetts law, governs the effect of the 1984 merger among Cranberry Growers, Dairy, and Delaware Food Store into Cumberland Farms, Inc., because the merger occurred in Delaware. Since we are concerned with the policy behind these two similar, if not identical, statutes, we refer to c. 156B, § 80, which is modeled after the Delaware statute, Del. Code Annot. tit. 8, § 259(a) (1988 ed.).

eral circumstances. See Black's Law Dictionary 1077 (5th ed. 1979).

Because of G. L. c. 156B, § 80, Cumberland stood in the shoes of Cranberry Growers and Dairy at the close of business on September 30, 1984, inheriting any liabilities for tortious conduct, as well as any privileges in the form of statutory immunities, that those predecessors would have had. See *Levitt* v. *Bouvier*, 287 A.2d 672 (Del. 1972) (holding a successor corporation would be liable, after merger, for a predecessor corporation's fraudulent misrepresentation, but that it also inherited an estoppel defense that the predecessor may have had). As the alleged negligent design, manufacture, and maintenance of the sanding buggy by Dairy and Cranberry Growers in this case occurred prior to their merger into Cumberland, any liability or privilege those entities possessed is lodged by law in Cumberland. Dairy was never Kevin Gurry's employer, and would have been susceptible to a third-party claim as a tortfeasor outside of the protection of workers' compensation. G. L. c. 152, § 15 (1988 ed.). However, Cranberry Growers would have been immune from suit since all the acts and omissions alleged against Cranberry Growers arose out of the direct employment relationship which existed between Cranberry Growers and Kevin Gurry. Therefore, the plaintiffs' rights as against Cranberry Growers would have been limited to benefits available under G. L. c. 152.

While Cumberland claims Cranberry Growers' immunity from suit for Kevin Gurry's death, it denies inheriting Dairy's liability for third-party negligence because it was Kevin Gurry's employer at the time of the accident.

It makes little sense to read c. 152 as insulating an employer from obligations it inherited through corporate merger simply because of the immunity for its own negligence it possessed as the employer of the insured employee. To avoid such a result, other courts and text writers have adopted the "dual persona" theory. Under this theory, if an employer's liability to an injured worker derives from a "second persona so completely independent from and unrelated to his status

as employer that by established standards the law recognizes it as a separate legal person," the employer is not immunized under the workers' compensation law, but is rather regarded as a third party. 2A A. Larson, Workmen's Compensation § 72.80 at 14-229 (1988 ed.). *Billy* v. *Consolidated Mach. Tool Corp.*, 51 N.Y. 2d 152 (1980). See *Robinson* v. *KFC Nat'l Management Co.*, 171 Ill. App. 3d. 867 (1988). *Kimzey* v. *Interpace Corp.*, 10 Kan. App. 2d 165 (1985). *Schweiner* v. *Hartford Accident & Indem. Co.*, 120 Wis. 2d 344 (1984).

Only one court has considered and rejected the doctrine. *David* v. *Sinclair Ref. Co.*, 704 S.W. 2d 413 (Tex. Ct. App. 1985). That two-to-one decision, however, confused the theory with an earlier, discredited theory called "dual capacity," which this court has also rejected. *Longever* v. *Revere Copper & Brass Inc.*, 381 Mass. 221, 225 (1980). The two theories are very different and virtually all the jurisdictions adopting the dual persona rule had declined to adopt the "dual capacity" rule.

The workers' compensation law was enacted to rectify inequities in the common law by providing fixed compensation to employees injured at work. In return, the employer was granted immunity from his employees' tort claims. *Longever* v. *Revere Copper & Brass, supra.* Clearly, therefore, the workers' compensation statute was intended to deal with injuries and liability occurring in the course of the employer-employee relationship. Here Cumberland's liability, if any, arises solely from the negligence of an independent corporation no longer in existence which has been acquired by Cumberland for its own purposes. To insulate Cumberland from liability it acquired, as a result of its merger with Dairy because it happened to be Kevin Gurry's employer, would subvert the important aims of both the workers' compensation system and the business corporation statute. Therefore, summary judgment should not have been granted Cumberland under G. L. c. 152, § 24, for any liability which it assumed when it acquired Dairy.

2. *Loaned servant and joint venture.* Cumberland's alternative arguments for summary judgment were all aimed at fixing liability for negligent design, manufacture, or maintenance of the sanding buggy in which Kevin Gurry was killed on Cranberry Growers, and thus absolving Cumberland due to the workers' compensation immunity it inherited from Cranberry Growers as a result of the merger. In order to prevail under these theories, it must be established for summary judgment purposes either that John Peck was a "loaned servant" of Cranberry Growers in connection with the design and manufacture of the buggy, or that Cranberry Growers and Dairy were engaged in a "joint venture" so as to constitute a "single employer" for the purpose of G. L. c. 152. Both are mixed questions of law and fact. See *Kelley* v. *Rossi*, 395 Mass. 659, 663-664 n.5 (1985); *Sawtelle* v. *Mystic Valley Gas Co.*, 1 Mass. App. Ct. 672, 675-676 (1974) (both cases dealing with the "loaned servant" question). See also *Searcy* v. *Paul*, 20 Mass. App. Ct. 134, 140 (1985); *Shain Inv. Co.* v. *Cohen*, 15 Mass. App. Ct. 4, 7-11 (1982) (both exploring the "joint venture" issue).

We therefore consider whether there was a genuine dispute of material fact, *Kelley* v. *Rossi, supra* at 660, on these issues. The burden of proving that no material factual dispute exists is on the moving party, even where the movant would not have had a burden on each of these issues if the case went to trial. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989). In assessing the record, we view the matters raised in the light most favorable to the plaintiffs, against whom summary judgment was entered. *Kelley* v. *Rossi, supra* at 661. We conclude that the defendant has not met that burden, and that, to the contrary, there are key factual matters in dispute. We discuss each issue briefly in turn.

Whether a person employed by one entity becomes a loaned servant of another entity to perform services for that entity, usually depends on whether the employee remained subject to the control of the original employer, or answered only to the second entity. *Kelley* v. *Rossi, supra* at 663-664. See *Ramsey's Case*, 5 Mass. App. Ct. 199, 202 (1977);

*Sawtelle* v. *Mystic Valley Gas Co., supra* at 675-677; Restatement (Second) of Agency § 227 comment b (1958). A presumption exists that an employee remains in the employ of his original principal, in the absence of evidence to the contrary. *Kelley* v. *Rossi, supra* at 664 n.5.

There was evidence[5] tending to show that Peck was not subject to the control of Cranberry Growers. He worked as a top corporate officer of Dairy, drew his salary from Dairy alone, and provided management services, much like a consultant, to a number of Delaware Food Store wholly-owned subsidiaries. He alone selected the craftsman to fabricate the sanding vehicles, provided him a model to copy, and communicated with him throughout the project.

Both the plaintiffs and the defendant characterize Peck's "work" as having served primarily the ends of the entity they respectively claim was his employer on the sanding buggy job. The plaintiffs point to evidence that Peck was supplying the management consulting services that it is part of Dairy's business to supply other subsidiaries like Cranberry Growers.

It is clear, therefore, that there is a dispute on several of the factual indicia that shed light on the ultimate issue of who controlled Peck on the sanding buggy job. As a result, we believe defendant Cumberland could not have been granted summary judgment on the ground that Peck had become an employee of Cranberry Growers.

Similarly, a factual question exists whether the two corporate entities were engaged in a "joint venture," so as to render them a single employer under c. 152, § 1 (5). Though similar to a partnership, a "joint venture" differs in that it is generally limited to a single transaction. *Shain Inv. Co.* v. *Cohen, supra* at 7. *Cardullo* v. *Landau,* 329 Mass. 5, 8 (1952). The key requirement in finding its existence is an intent to associate. *Id.* In Massachusetts, factors indicating such an intent include an agreement among the participants

---

[5]Such evidence was derived from depositions and affidavits made on the basis of personal knowledge, and thus were in the proper form to comprise a record for summary judgment. Mass. R. Civ. P. 56 (c) & (e), 365 Mass. 824 (1974).

for joint profits and a sharing of losses; a contribution of money, assets, talents, etc., to a common undertaking; a joint property interest in the subject matter of the venture; and a right to participate in the control of the venture. *Id.* at 9. See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 625 (1964). *Searcy* v. *Paul, supra* at 140 n.9.

When the issue of a party's intent constitutes the essential element of a cause of action or defense, the granting of summary judgment is disfavored. *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 86 (1984). That is especially the case when, as here, there is no written agreement embodying the alleged intent.

The record before the motion judge presented conflicting evidence on this issue. The defendant submitted evidence of a consolidated tax return reflecting both the profits and losses of Cranberry Growers and Dairy; the shared workers' compensation policy; the common ownership and control of the two companies; the shared enterprise of the "Cumberland Farms" system, in which Cranberry Growers sold its cranberries to processors, from which Dairy purchased cranberry juice, and which, in turn, Dairy distributed to other Delaware Food Store subsidiaries. In addition, the defendant points to such facts as Dairy's provision of administrative and managerial services to other subsidiaries; those subsidiaries' payment to Dairy for those services; the use of Dairy's personnel and requisition forms and procedures by Cranberry Growers; and Peck's hiring of the Cranberry Growers' manager who, in turn, hired Kevin Gurry, as indicating a joint venture. On the other hand, there was evidence that distinct profit and loss statements were prepared for each entity, and that the "venture" the defendant characterizes as joint was no single undertaking, but a general method of conducting business.

The mere fact of common management and shareholders among related corporate entities has repeatedly been held not to establish, as a matter of law, a partnership, agency or "joint venture" relationship that renders the corporations a "single employer," *Galdi* v. *Caribbean Sugar Co.*, 327 Mass.

402, 407-408 (1951). *Searcy v. Paul, supra* at 140 n.9. *Westcott Constr. Corp. v. Cumberland Constr. Co.*, 3 Mass. App. Ct. 294, 297 (1975). In other jurisdictions, these factors, as well as the sharing of workers' compensation policies and managerial and administrative services among related corporations, have been held insufficient to require the finding of a "single employer" for workers' compensation purposes.[6] In applying Pennsylvania law, the United States Court of Appeals for the Third Circuit ruled under similar circumstances that two corporations could have common stockholders and common management, but "[a]s to their relations to an employee under the compensation law each corporation must be regarded as a separate entity and the labor performed by a workman for one of them cannot be cumulated with an agreement to perform services for the other." *Joyce v. Super Fresh Food Mkts., Inc.*, 815 F.2d 943, 945 (3d Cir. 1987), quoting *Butera v. Western Ice & Utils. Co.*, 140 Pa. Super. 320, 333 (1940).

Therefore, we conclude that a dispute of fact existed on the question whether Cranberry Growers and Dairy were engaged in a "joint venture" that qualified them for "single employer" status under c. 152.

3. *Piercing the corporate veil.* Finally, the defendant has suggested that, relying on much the same evidence as it does in its "joint venture" theory, the court might pierce the corporate veils of Cranberry Growers and Dairy to reach the conclusion that they constituted a "single employer."

The rule in the Commonwealth is that corporations are to be regarded as separate entities where there is no compelling

---

[6]See *Gulfstream Land & Dev. Corp. v. Wilkerson*, 420 So.2d 587, 589 (Fla. 1982); *Gaber v. Franchise Servs., Inc.*, 680 P.2d 1345 (Colo. Ct. App. 1984); *Boswell v. May Centers, Inc.*, 669 S.W.2d 585, 587 (Mo. Ct. App. 1984); *Gigax v. Ralston Purina Co.*, 136 Cal. App. 3d 591 (1982); *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 658, 662 (6th Cir.), cert. denied, 444 U.S. 836 (1979) (interpreting Kentucky law); *Gaines v. Excel Indus., Inc.*, 667 F.Supp. 569, 576 (M.D. Tenn. 1987); *Latham v. Technar, Inc.*, 390 F. Supp. 1031, 1037 (E.D. Tenn. 1974) (interpreting Tennessee law); *Thomas v. Hycon Inc.*, 244 F.Supp. 151, 155 (D.D.C. 1965) (interpreting Maryland law).

reason of equity "to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries." *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968), quoting *M. McDonough Corp.* v. *Connolly*, 313 Mass. 62, 65-66 (1943). We will pierce the corporate veil only "in rare particular situations in order to prevent gross inequity." *My Bread Baking Co.* v. *Cumberland Farms, supra* at 620. In *Searcy* v. *Paul*, 20 Mass. App. Ct. 134 (1985), the Appeals Court "perceive[d] no basis . . . for extending the Massachusetts decisions with respect to 'disregarding the corporate fiction' so as to provide a third party corporation immunity from an action by an employee of a somewhat affiliated corporation which had made a workers' compensation settlement with that employee." *Id.* at 139.

Similarly, most courts refuse to allow corporations to assume the benefits of the corporate form and then disavow that form when it is to their and their stockholders' advantage. *Shelby County* v. *Barden*, 527 S.W. 2d 124, 130 (Tenn. 1975). *Joyce* v. *Super Fresh Food Mkts., supra* at 946. *Krull* v. *Celotex Corp.*, 611 F. Supp. 146, 149 (N.D. Ill. 1985). *Gaber* v. *Franchise Servs., supra* at 1346. *Smith* v. *Cotton's Fleet Serv., Inc.*, 500 So. 2d 759, 763 (La. 1987). We find those views highly persuasive.

We conclude that Cumberland cannot for its own convenience disregard its predecessor corporations' separate identities.[7]

We hold the judge erred in granting summary judgment to the defendant. We therefore reverse and remand this case for

[7]Cumberland understandably places great reliance on *Wells* v. *Firestone Tire & Rubber Co.*, 421 Mich. 641 (1984), the sole decision of which we are aware that allows a defendant corporation to pierce its own corporate veil. However, a key distinction in *Wells* was that the injured employee of a subsidiary himself disregarded the corporate form to assert the parent corporation was his employer for obtaining workers' compensation payments, and then filed a products liability action against that parent, as well. No court outside Michigan has followed *Wells*, and a Michigan court has limited *Wells* to its own peculiar fact situation. See *Wodogaza* v. *H & R Terminals, Inc.*, 161 Mich. App. 746 (1987).

further proceedings in accordance with the views expressed here.

*So ordered.*