**POINTER (U.S.A.), INC., Plaintiff,**

v.

**H & D FOODS CORPORATION and Xue Yun Zhang a/k/a Wingyun Zhang, Defendant.**

**No. 97 Civ. 5333(TPG).**

United States District Court, S.D. New York.

Aug. 19, 1999.

James J. Sabella, Brown & Wood LLP, New York City, for plaintiff.

Bernard D'Orazio, P.C., New York City, for defendants.

## Opinion

GRIESA, District Judge.

Plaintiff Pointer (U.S.A.), Inc. ("Pointer") brings this action for breach of contract, quantum meruit and unjust enrichment following defendant H & D Foods Corporation's ("H & D's") failure to repay Pointer the amount of the purchase price of a shipment of frozen seafood received by H & D pursuant to a series of written sales agreements entered between the parties in late 1995 and early 1996.

The parties have filed cross-motions for summary judgment. It is undisputed that H & D is liable to Pointer in the amount of $2,839,779.78 in accordance with a repayment agreement negotiated by the parties after H & D failed to pay the original purchase price under the sales agreements. By Order dated May 28, 1999 the court granted plaintiff's motion for summary judgment against H & D in the amount of $2,839,779.78 plus statutory annual interest of 9% from February 28, 1997.

H & D, however, is insolvent and has ceased operations. The remaining issue on the cross-motions, and in the case as a whole, is whether Pointer can pierce the corporate veil and recover from the company's president and sole shareholder, defendant Xue Yun Zhang.

## Facts

H & D is a Massachusetts corporation formerly engaged in the business of buying and importing seafood from China and distributing it wholesale to restaurants and supermarkets in the United States. Pointer is a New York corporation formerly engaged in the business of importing food and chemical products. Pointer is one of several affiliated corporations owned by a company called Sinochem headquartered in Hong Kong. Both Pointer and H & D have ceased operations as a result of the facts underlying this lawsuit.

Zhang states in his affidavit that he began working in the seafood business in 1992, importing, buying and selling product as a sole proprietor. In 1993 Zhang incorporated his business as H & D Foods and relocated his facility to 87 Kemble Street in Boston. As the company's sole director, officer, and shareholder, Zhang was responsible for all corporate business decisions. H & D hired 15 full-time employees in its first year and obtained a $1 million line of credit from State Street Bank & Trust Company.

H & D's unaudited financial statements for 1993 showed an initial capitalization of $100,000 and an additional $44,455 paid-in capital during the year. Net sales in 1993 totaled $5,662,682 and gross profits totaled $425,744. Out of a reported net income of $324,889, Zhang paid a shareholder distribution to himself of $134,467 and other distributions of $23,000, leaving $167,422 in retained earnings.

The audited financial statements for 1994 reported a dramatic increase in net sales to $13,483,719 and gross profits to $1,248,956. H & D reported net income of $26,671 for the year. There were no shareholder distributions, leaving all of the net income as retained earnings within the company.

Zhang states that the last audited financial statements prepared for H & D were for the 1994 calendar year. The court has been provided with unaudited, computer-generated balance sheets for 1995 and 1996. The company did not cease its operations until the spring of 1997, and its bylaws expressly required the preparation of a balance sheet each year.

After two profitable years in 1993 and 1994 marked by substantial growth, H & D's business rapidly declined as a direct result of sudden market changes in 1995. Zhang states that he believed H & D's business prospects were good at the start of the 1995 crawfish season, in light of the expansion in business during the previous two years. H & D purchased and imported a total of 46 containers of frozen crawfish from Chinese suppliers in 1995 at a cost of $5.8 million—a quantity that approached the total amount of frozen crawfish exported from China to the United States by all importers in 1994.

Beginning in 1995, however, the United States seafood market was unexpectedly inundated with imported frozen crawfish, ultimately leading the U.S. International Trade Commission to impose punitive antidumping duties on Chinese suppliers in August 1997 at the behest of domestic crawfish suppliers in Louisiana. As a result, the wholesale market price for crawfish plummeted from a high of $4 per pound at the end of 1994 to a low of $2.25 by 1996.

Zhang states that, faced with selling H & D's inventory at a loss, he decided to hold onto the product during 1995 and wait for prices to recover. Prices did not recover, however, and because the shelf-life for frozen crawfish is only 18 months, Zhang states that he had no choice but to liquidate H & D's entire crawfish inventory during the period from April to December 1996 at an average price of $2.30 per pound causing a total loss to the company of over $3 million for the 1995–1996 season. It is undisputed that the downturn in the crawfish market in 1995 led directly to H & D's failure in 1997.

Between November 1995 and January 1996, which Zhang states was just before

the market for crawfish collapsed, H & D Foods entered into a series of contracts with Pointer. Though the contracts purport to be contracts for the sale of frozen seafood from Pointer to H & D, Pointer's true role in the transaction was to provide financing.

According to the deposition testimony of Kamling To, former president of Pointer who negotiated and signed the contracts with H & D, Zhang represented to Pointer during preliminary discussions that he was seeking to expand H & D's market share in the wholesale distribution of frozen seafood in the United States. Toward that end, Zhang wished to purchase larger quantities of crawfish from his Chinese suppliers than he had in the past, but he did not have the credit facility to do so. H & D's 1994 financial statement reported a note payable on a line of credit of $967,240. Presumably this liability related to H & D's $1 million line of credit from State Street Bank & Trust Company.

The sales contracts ultimately entered into by the parties contemplated that Pointer would purchase frozen seafood—including crawfish and, in later contracts, scallops—from H & D's Chinese suppliers outright, using its own lines of credit, and then sell the product to H & D which would in turn distribute the seafood among its wholesale customers in the United States. The contracts provided that H & D would have 45 days from the date of Pointer's book loan from its bank to pay back to Pointer the purchase price of the seafood plus a profit margin of between 2–5% depending upon the contract. H & D also undertook to pay all of Pointer's interest and other expenses associated with obtaining its line of credit.

Pointer's role in the transactions was merely to provide the credit necessary to enable H & D to expand its importation of frozen seafood for which H & D could not obtain sufficient credit on its own. All other aspects of the deal were handled by H & D. It was Zhang who traveled to China and negotiated the purchases of sea-food from Chinese suppliers on Pointer's behalf, and it was H & D that assumed all liability for any potential costs or problems arising from the importation of the seafood from China to the United States.

Kamling To testified at her deposition that Zhang explicitly told her during preliminary discussions that H & D could not obtain its own line of credit from the bank to pay for the purchase of the seafood. According to To, at one point, Pointer requested security from H & D for the seafood it was to purchase on H & D's behalf, but H & D was not able to provide any.

Nevertheless, To testified that no one at Pointer ever requested or reviewed H & D's financial statements or attempted to contact other suppliers of H & D or H & D's bank to check on H & D's creditworthiness.

At one point To indicated that whenever Pointer opened a new account with a customer, a credit investigation was normally conducted by Sinochem America, a sibling company to Pointer that provided Pointer with the capital it needed to do business. Sinochem America is a corporate affiliate of Pointer's corporate parent, Sinochem. Defense counsel asked To whether Pointer obtained the approval or consent of Sinochem America to enter into the transactions with H & D to which To stated that each corporate affiliate made its own final decisions and simply requested the necessary capital from Sinochem America. There is no indication on the record that Sinochem reviewed H & D's financials or performed any inquiry into the company's financial condition.

Elsewhere in her testimony, To asserts that during the course of business discussions prior to entering into the sales contracts, Zhang represented to her that H & D owned significant fixed assets, consisting of the cold storage and processing facilities at 87 Kemble Street in Boston that H & D had moved into in 1993. To visited the facilities at Zhang's invitation prior to en-

tering into the contracts. To states that she believed, at the time Pointer entered into the contracts with H & D, that H & D had sufficient assets to secure payment for the seafood Pointer purchased on H & D's behalf.

In fact, H & D did not own the office, cold storage or processing facilities that it occupied as of late 1995. The entire property at 87 Kemble Street was instead owned by a realty investment trust called H.D. Realty Trust ("H.D.Realty") in which Zhang owned a 50% interest.

According to Zhang's affidavit and the affidavit of a business partner, Michael Burke, in 1993 Burke and his associate Teddy Adams, who were principals in a Rhode Island seafood company called Seafood Resources, first approached Zhang about the possibility of purchasing a cold storage and processing plant facility. At the time, the property located at 87 Kemble Street was for sale on the market by a third-party. Zhang, Burke and Adams agreed to purchase the property from the third party and to set up a realty investment trust through which they would jointly own it. They also agreed to set up a separate corporation called Boston Cold Storage, Inc. which would lease from H.D. Realty the cold storage and processing facility. It is unclear from the record what the ownership interests of the three partners were in Boston Cold Storage. It was agreed, however, that H & D would in turn rent office space and would rent at least some of the storage and processing facilities at 87 Kemble Street from Boston Cold Storage.

The purchase of the 87 Kemble Street property was made in several steps. First, H & D Foods purchased the property from the third party seller in its own name on August 25, 1993 for $440,000. The purpose of this was to, in effect, advance the purchase price for the benefit of the partners. Zhang and Burke state that it was their intention all along that H & D would be repaid in full once the three partners arranged bank financing. On Au-

gust 30, 1993 Zhang, Burke and Adams established H.D. Realty Trust in which it was agreed that Zhang would hold a 50% ownership interest and Burke and Adams a 25% interest each. On September 1, 1993 H & D Foods conveyed the deed to 87 Kemble Street to Burke, as trustee for H.D. Realty Trust, for consideration of $1.

Bank financing was thereafter arranged on February 4, 1994. H.D. Realty borrowed $550,000 from Fleet National Bank, secured by a first mortgage on the Kemble Street property. On February 14, 1994 Burke, as trustee, issued a check to H & D Foods in the amount $220,000 and another check to Seafood Resources in the amount of $219,966. Burke states that the balance of the loan from Fleet Bank was retained by H.D. Realty as its operating capital. According to Burke and Zhang, the $219,966 check issued to Seafood Resources was credited to H & D as satisfaction of a debt H & D owed to Seafood Resources for a quantity of seafood it had previously purchased from the company.

Thus, between the check it received directly and the credit against its debt to Seafood Resources, H & D was repaid a total of $439,966 roughly 5½ months after it advanced the purchase price of $440,000.

The notes to H & D's financial statements for 1993 and 1994 indicate that, after the Kemble Street property was conveyed to H.D. Realty, H & D occupied and rented the facilities from H.D. Realty as a tenant-at-will. The 1993 and 1994 financial statements showed that in 1993 H & D paid a rent of $5,000 per month and in 1994 a total rental of $57,000. The notes to the 1993 and 1994 financials also disclose that H & D was guarantor of the $550,000 debt of H.D. Realty to Fleet Bank. The $5,000 per month rental paid by H & D to H.D. Realty in 1993 and the $57,000 total rent paid in 1994 were sufficient to cover H.D. Realty's repayment of principal under the mortgage in the amount of $4,583.33 per month.

H & D's unaudited 1995 and 1996 balance sheets show an "investment," by H & D in Boston Cold Storage of $114,931.34. There is no explanation for this transaction, or any documentation for it submitted on the present motions.

H.D. Realty continued to own the Kemble Street property until October 1998 when it sold the property to a third party for $600,000. Pursuant to the schedule of beneficial interests in H.D. Realty, Zhang would have received $300,000 from the sale.

### Discussion

The parties agree that because H & D is a Massachusetts corporation, under New York choice of law principles, the question of whether to pierce the corporate veil is governed by Massachusetts law. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).

■ The Massachusetts Supreme Judicial Court has repeatedly stated in a variety of factual settings that under Massachusetts law corporations are to be regarded as separate entities except in rare instances where it is necessary "to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries." *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618, 233 N.E.2d 748, 751 (1968); *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 626, 550 N.E.2d 127, 134 (1990). *See also Spaneas v. Travelers Indemnity Co.*, 423 Mass. 352, 354, 668 N.E.2d 325, 326 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form."); *Gordon Chemical Co. v. Aetna Casualty and Surety Co.*, 358 Mass. 632, 638, 266 N.E.2d 653, 657 (1971) ("It is only where the corporation is a sham, or is used to perpetuate deception to defeat a public policy, that it can be disregarded.").

■ Massachusetts courts have adopted a list of factors for consideration in determining whether the facts of a particular case warrant piercing the corporate veil. On this issue a court may consider whether there was: (1) majority ownership and pervasive control of the affairs of the corporation; (2) thin capitalization; (3) nonobservance of corporate formalities or absence of corporate records; (4) no payment of dividends; (5) nonfunctioning of officers and directors; (6) insolvency of the corporation at the time of the litigated transaction; (7) siphoning of corporate funds or intermingling of corporate and personal funds by the dominant shareholder(s); (8) use of the corporation for transactions of the dominant shareholder(s); and (9) use of the corporation in promoting fraud. *See Evans v. Multicon Construction Corp.*, 30 Mass.App.Ct. 728, 733, 574 N.E.2d 395, 398 (1991). Obviously, some factors may have weight in a given case and some may not. The central concern to which all of these factors are addressed is whether the corporate form has been so abused in a particular case that it is necessary to disregard it to defeat fraud or wrong or gross inequity.

■ It is necessary now to apply the standards established by Massachusetts law to the facts of the present case.

H & D was in the business of purchasing and importing seafood from China on credit and distributing it wholesale to supermarkets and restaurants in the United States. As the amount of seafood H & D sought to handle increased, the company sought increasingly substantial lines of credit. Pointer agreed to provide the credit H & D required to expand its business further. Pointer contends, however, that in extending credit to H & D in 1995, it was entitled to assume that H & D possessed unencumbered capital reasonably adequate to cover its prospective liabilities.

What Pointer ignores is the undisputed fact, as testified to by Pointer's president Kamling To, that Pointer knew that H & D lacked sufficient assets to obtain a line of

credit from the bank itself, and similarly, to secure the line of credit that Pointer ultimately extended to H & D. Thus, there was no basis for Pointer to have assumed that H & D had sufficient unencumbered assets to cover its prospective liability to Pointer.

To the contrary, the facts show that in financing H & D's purchases of seafood from Chinese suppliers, Pointer took a calculated risk, based on the past growth and success of H & D in 1993 and 1994, that H & D would profit from selling seafood to its restaurant and supermarket customers during the 1995–96 season and pay back Pointer within a very short time—only 45 days under the terms of the contracts—both the principle of the loan plus a 2–5% return. This was the basic premise of the financing arrangement agreed upon by the two companies. Pointer used its own line of credit to provide financing for H & D's business precisely in exchange for a quick share of the profits in that business. Unfortunately, both companies were wrong. The market unexpectedly collapsed causing H & D to sell its inventory at a loss of $3 million.

Kamling To testified, however, that Zhang misrepresented to her that H & D owned the office, storage and processing facilities it occupied at 87 Kemble Street, and that she relied on that representation in agreeing to do business with H & D. Zhang denies that he made such a representation to To.

Although this presents an issue of fact that cannot be decided on the motions, it is not sufficient to warrant submitting the issue of veil piercing to a jury. Pointer is not suing Zhang for fraud in this case but is attempting to hold Zhang personally liable for H & D's debt to Pointer. If To in fact relied on this single statement in agreeing to do business with H & D, she nevertheless knew that she was dealing with a company that operated on credit from one season to another and that did not possess sufficient assets to obtain a line of credit for the 1995–96 season on its own. There is no indication that To thought she was doing business with Zhang personally rather than the company. Moreover, To has admitted that Pointer requested security from H & D and that H & D was unable to provide it. Thus, it must have been clear to Pointer that the 87 Kemble Street property, even if H & D did own it, was not available as security for the line of credit Pointer provided to H & D. Also, if either Pointer or Sinochem America had requested to look at H & D's financial statements for 1993 or 1994, they would have seen instantly that the real estate was not an asset of the company but that H & D rented the space as a tenant at will.

Pointer makes other arguments about the lack of corporate records and Zhang's use of H & D assets for personal investments. To the extent that there were deficiencies in corporate record keeping, this circumstance is of no significance on the present motions.

■ It is true, however, that Zhang caused H & D to finance the purchase of the Kemble Street property for H.D. Realty's benefit in which Zhang owned a 50% interest. H & D also appears to have made an interest free loan to Boston Cold Storage. Neither transaction seems to have offered any business advantage to H & D.

Nevertheless, these transactions in no way indicate, when viewed in the context of the facts as a whole, that H & D was a sham or that the corporate form was something fundamentally misleading. Although Zhang, as owner of H & D, did use certain corporate funds to the benefit of himself and his partners in the real estate transactions, he was, after all, the owner, and as such was entitled to obtain distributions to a degree. One can quarrel with the method and the amount of money involved in the transactions. But the real activity of H & D that Pointer relied on was H & D's marketing of millions of dollars worth of imported seafood. H & D

was, without question, carrying on this business. It was the collapse of this business that caused the loss to Pointer. The use of a relatively small amount of cash in connection with the real estate matters in no way made the seafood importation business of H & D a sham, nor did it contribute to the failure of that business. Pointer was not confused about who or what entity it was dealing with, or misled into doing business with an entity it would not otherwise have dealt with. Pointer extended credit to H & D on the understanding that H & D did not have unencumbered assets with which to secure a line of credit. To pierce the corporate veil on these facts would not serve to defeat a fraud, wrong or injury sustained by plaintiff from defendant's neglect or abuse of the corporate form.

### Conclusion

For the foregoing reasons, the court holds that there is no basis for piercing H & D Foods' corporate veil so as to allow Pointer to recover from Zhang personally. There is no triable issue of fact on the point. Defendant Zhang's motion for summary judgment is granted and the case is dismissed.

SO ORDERED