NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

18-P-1309                                    Appeals Court

XUDONG YANG'S[1] (dependents') CASE.

No. 18-P-1309.

Suffolk.     May 8, 2019. - August 13, 2019.

Present:  Milkey, Hanlon, & Sacks, JJ.

Workers' Compensation Act, Decision of Industrial Accident Reviewing Board, Street risk.  Insurance, Workers' compensation insurance.

Appeal from a decision of the Industrial Accident Reviewing Board.

Beth R. Levenson for the claimant.
Richard L. Neumeier (John C. White also present) for the insurer.

MILKEY, J.  Xudong Yang (the decedent) was the principal of a family-owned business known as Oriental International Trading Corp. (OITC).  On February 4, 2014, he died in an automobile accident.  His widow, Chuan Zhang,[2] filed a claim seeking death

_____

[1] Also known as Mark Yang and Mark Young.

[2] Also known as Joanne Young.

benefits from Norfolk & Dedham Mutual Fire Insurance Company, OITC's workers' compensation insurer (the insurer).[3]  An administrative judge at the Department of Industrial Accidents (department) denied the claim after a three-day hearing, concluding that the trip during which the decedent was killed was not undertaken in the course of OITC's business.[4]  After the department's reviewing board summarily adopted the administrative judge's decision, Zhang appealed to this court pursuant to G. L. c. 152, § 12 (2).[5]  For the reasons that follow, we affirm.

Background.[6]  According to its articles of organization, OITC was formed "[t]o own and operate [an] import and export

_____

[3] The benefits Zhang sought included survivor benefits pursuant to G. L. c. 152, § 31, and burial expenses pursuant to G. L. c. 152, § 33.  Zhang filed the claim on her own behalf and on behalf of the couple's minor daughter.

[4] Prior to the formal hearing held pursuant to G. L. c. 152, § 11, Zhang proceeded through the first two steps of the department's dispute resolution process:  namely, she entered into an initial informal conciliatory proceeding with the insurer, pursuant to G. L. c. 152, § 10, and then, when an agreement was not reached, the case was referred to the Industrial Accident Board of the department for an informal conference before an administrative judge, pursuant to G. L. c. 152, §§ 10-10A.  See Murphy v. Commissioner of the Dep't of Indus. Accs., 415 Mass. 218, 223 (1993).

[5] The reviewing board is a panel of three administrative law judges.  See G. L. c. 23E, § 5; Murphy v. Commissioner of the Dep't of Indus. Accs., 415 Mass. 218, 225 n.13 (1993).

[6] The factual recitations that follow are drawn from the administrative judge's findings, although we additionally

business in Norwood, Massachusetts, and to generally engage in and carry on any business related thereto."  OITC specifically served as a "manufacturer's representative" that imported chemicals from China for sale to domestic companies that manufactured pharmaceuticals, food supplements, and animal feed. The decedent was "solely responsible for running [OITC's] business at all times prior to his death."  In Zhang's own words, the decedent "called all the shots."  Zhang also worked at OITC, and she and the decedent were OITC's sole officers, directors, and shareholders.

In 2005, OITC purchased a workers' compensation policy from the insurer to cover its employees.  On its application for the policy, OITC listed four employees (including the decedent and Zhang), two in sales and two doing clerical work.  No out-of-State travel was indicated on the application, which also stated that OITC was not "engaged in any other type of business."  OITC renewed its workers' compensation policy annually, and the insurer performed "premium audits" to review whether its premiums should be adjusted based on the risks presented.[7]

"mention for purposes of clarity undisputed facts not expressly found."  Caron's Case, 351 Mass. 406, 407 (1966).

[7] Depending on the type of coverage plan that an employer elects, insurers may be able to adjust premiums retrospectively as a result of the premium audits.  See generally Home Indem. Ins. Co. v. Merchants Distribs., Inc., 396 Mass. 103, 104 & n.1 (1985) (explaining that under "a retrospective premium

According to the insurer's underwriter, OITC's being engaged in "any other business . . . was never indicated at any point in the file including [through] subsequent premium audits that were done over the course of the policy."  Premiums periodically were adjusted to reflect up-to-date information regarding the number of employees, their job classifications, and their current salaries.

The decedent also was engaged in various other commercial enterprises.  One of those businesses was a restaurant in Belmont, New Hampshire, known as the Garden Oasis Family Restaurant (the restaurant).[8]  The restaurant was operated by Garden Oasis Family Restaurant LLC, a limited liability corporation that the decedent formed and incorporated in New

---

endorsement, . . . an employer's premium obligation, subject to maximum and minimum limits, is affected by the employer's loss experience during the policy period").  There was testimony from the insurer's underwriter suggesting that the plan chosen by OITC was of the sort for which premiums could be adjusted retrospectively.  The policy itself seems to suggest that the option of retrospective adjustments was not selected, and the administrative judge did not address this specific point in her findings.  In arguing that allowing coverage here would not be unfair, Zhang seeks to make use of the fact that premiums could be adjusted retrospectively.  For purposes of this appeal, we assume arguendo that this is the case, even though the point lies in some doubt.

[8] Notably, OITC's insurance underwriter testified that the insurer did "not write workers' compensation in the [S]tate of New Hampshire.  So if [it] had been made aware of [a new business entity in New Hampshire], [it] would not have been insuring [it] for workers' comp[ensation]."

Hampshire.  The New Hampshire property formally was managed by a separate entity, 223 DW Highway, LLC.[9]

The restaurant, which opened in 2010, had its own New Hampshire-based staff (a manager, cooks, and waiters).  However, the restaurant's bookkeeping was done out of OITC's Norwood offices by the person who served as OITC's accounts manager. OITC itself entered into the construction contracts for the restaurant, and "[t]he funds to build the restaurant came from the main checking account at OITC."  Moreover, although the restaurant had its own bank account, at the direction of the decedent, OITC's accounts manager frequently used OITC's bank account to pay the restaurant's ongoing bills, including mortgage payments, utility bills, and the like.  Such financial intermingling extended beyond the decedent's corporate entities to his personal finances as well.  For example, "OITC paid bills personal to the [decedent] including but not limited to his daughter's college tuition, personal loans[,] and his mother's funeral."

The restaurant venture was short-lived, and it closed by the end of 2010, the same year it opened.  According to Zhang's testimony, the decedent eventually decided to sell the property

---

[9] The record suggests that 223 DW Highway, LLC, held title to the restaurant property, but the administrative judge did not directly address this in her findings.

on which the restaurant had been located, because the failed venture had become a financial drain.[10]  While driving to New Hampshire to meet a real estate broker and a potential buyer, the decedent was killed in a car accident.

Discussion.  From its enactment in 1911, the workers' compensation act has covered injuries "arising out of and in the course of [an employee's] employment."  G. L. c. 152, § 26.  The just-quoted language was interpreted generally as covering injuries incurred at the workplace, but not those incurred in travel away from the workplace.[11]  Bell's Case, 238 Mass. 46, 50 (1921) ("If [an employee] is injured on the public street, he does not come within the benefit of the act, unless his work is of a kind which is pursued on the highway and he is engaged at the time of the accident in the actual work for which he is

---

[10] There was evidence that OITC covered all ongoing expenses of the New Hampshire venture after the restaurant failed, but Zhang has made no argument that OITC was legally obligated to do so based on a theory of veil piercing or otherwise.  See Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 557 (2000), citing My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618-619 (1968).  Nor did Zhang argue that OITC and the entities owning or operating the restaurant "were engaged in a 'joint venture' so as to constitute a 'single employer' for the purpose of G. L. c. 152."  Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 622 (1990).

[11] We note that injuries caused by work-related automobile travel likely were relatively rare at the time the act was enacted.

employed, and not merely using the highway in the exercise of the public right of passage").

In 1927, the Legislature amended the statute to expand its coverage regarding work-related travel.[12]  St. 1927, c. 309, § 3. See Higgins's Case, 284 Mass. 345, 349 (1933) (characterizing 1927 amendment as creating "an additional class of compensable personal injuries").  Specifically, the Legislature expanded the language of the statute to also cover injuries "arising out of an ordinary risk of the street while actually engaged, with [the] employer's authorization, in the business affairs or undertakings of [the] employer."  St. 1927, c. 309, § 3.  In determining whether employee travel was covered under this language, "[t]he test or legal standard to be applied is whether the employment or something else sent the employee on the journey."  Mandell's Case, 322 Mass. 328, 331 (1948).[13]  "If the

---

[12] As a general rule, "going to or coming from [an employee's] place of employment," (that is, ordinary commuting), is still not covered.  Caron's Case, 351 Mass. 406, 409 (1966), and cases cited.

[13] The parties agree that Mandell's Case, despite its age, remains the leading case on whether injuries sustained during travel away from the workplace are covered under the statute. In that case, the principal of a company became seriously ill while in Mexico on a trip that had been wholly funded by the company.  322 Mass. at 329.  In addition, there was evidence that the principal purchased some office furniture while on the trip.  Id.  Nevertheless, the Industrial Accident Board denied the principal's claim for workers' compensation benefits on the ground that the trip "was undertaken mainly for pleasure or for

former, the risk of the journey is a hazard of the employment; if the latter, it is the personal risk of the employee."  Id. Accord Caron's Case, 351 Mass. 406, 409 (1966).  So long as the injured party's employment with the insured was "one of the causes which impelled him to make th[e] trip," he would not lose coverage simply because he obtained independent personal benefits from it.  Mandell's Case, supra at 330.  "While an employee may have more than one motive for performing an act, as long as one significant purpose is related to the employment the employee will be considered to be acting in the course of her employment."  Mendes v. Tin Kee Ng, 400 Mass. 131, 134-135 (1987), citing Wang Labs., Inc. v. Business Incentives, Inc., 398 Mass. 854, 859-860 (1987).

"The purpose of the trip [during which the employee was injured] and its relation, if any, to the employment [are] questions of fact."  Mandell's Case, 322 Mass. at 331.  In the case before us, the administrative judge found that the decedent "at the time of the accident was advancing his own personal interest, heading to meet the real estate broker to sell the vacant property of his failed business in New Hampshire, and not the interest of OITC."  As a result, the administrative judge

---

some other purpose than in the interest of the employer."  Id. at 330.  The Supreme Judicial Court affirmed.  Id. at 333.

denied and dismissed the claim. The reviewing board summarily affirmed the administrative judge's decision.

We review decisions of the reviewing board in accordance with G. L. c. 30A, § 14 (7), and "may reverse or modify the board's decision where it is based on an error of law, or is arbitrary, capricious, or otherwise not in accordance with law." Wilson's Case, 89 Mass. App. Ct. 398, 400 (2016). We do not review the underlying factual findings for substantial evidence. Id. See G. L. c. 152, § 12 (2). Rather, settling questions of fact is "the exclusive function" of the agency fact finders, and findings "are to be sustained whenever possible." Mandell's Case, 322 Mass. at 330.[14]

---

[14] At the time Mandell's Case was decided, claims initially were heard by a single member of the Industrial Accident Board, and then reviewed by the full board. See 322 Mass. at 329. In 1985, the Legislature "limit[ed] the reviewing board's ability to overturn a decision of a member of the Industrial Accident Board to instances where the decision '[was] beyond the scope of his authority, arbitrary or capricious, contrary to law, or unwarranted by the facts.'" Pospisil's Case, 402 Mass. 820, 820 (1988), quoting G. L. c. 152, § 11C. Then, in 1991, the Legislature implemented a formal division of dispute resolution within the department, pursuant to St. 1991, c. 398, and "overhaul[ed] the procedures by which injured workers (claimants) [could] seek compensation under the [workers' compensation] [a]ct." Murphy v. Commissioner of the Dep't of Indus. Accs., 415 Mass. 218, 223 (1993). This dispute resolution process consists of four steps: conciliation, informal conference, formal hearing, and finally, appeal to the reviewing board. See id. at 223-225 & n.13. See also note 4, supra. The reviewing board still may overturn an administrative judge's decision only "if it determines that such administrative judge's decision is beyond the scope of [her] authority,

The administrative judge's finding that the decedent was traveling to New Hampshire to serve his personal interests, not those of OITC, is amply supported in the record. The undisputed financial intermingling that was present here does not dictate a different result. Certainly, the fact that OITC largely funded the restaurant venture is a factor to be considered in examining whether it was part of OITC's business, but we do not consider that conclusive. Cf. id. at 331 (fact that employer had fully funded trip in which employee was injured was "important" factor in determining "purpose of the trip and its relation, if any, to the employment" but it was "not a decisive factor"). In this regard, the administrative judge properly could take into account that the injured employee here was the principal of the company. See id. at 331-332 (fact that payments from employer to fund trip were made "to one who held the principal offices and a majority of [the employer's] capital stock might properly be regarded in a somewhat different light than a similar payment to one who stood in no other relation to the corporation than that of an employee whose only duty was to purchase merchandise for the corporation"). In other words, where the travel at issue was by a person who had unfettered control of the "strings of the corporate purse," there might be cause for greater

---

arbitrary or capricious, or contrary to law." G. L. c. 152, § 11C.

scrutiny whether the travel properly should be considered as being undertaken at the employer's behest or instead for personal reasons.  Id. at 332.

The administrative judge's decision is consistent with sound policy considerations, because it does not render the insurer liable for risks beyond those the insurer agreed to cover.  This is not a case where there was a "natural connection" between the business of OITC and that of the restaurant.  Pallotta's Case, 251 Mass. 153, 155 (1925).  Compare Wright's Case, 291 Mass. 334, 335, 336-337 (1935) (Vermont lumber business operated by Massachusetts ice business not "separate and distinct" for purposes of worker's compensation where two businesses "complement[ed] each other and together . . . constitute[d] a single year around business, carried on by the same corporation under one management and control and with largely the same employees"), with Pallotta's Case, supra (employee working as "digger and loader of sand" was not covered by workers' compensation policy for employer's trucking business where there was no "natural connection" between two businesses, and policy applied only to "driver, chauffeur or helper of such, . . . stableman, garageman, blacksmith, repairman or rigger").

To be clear, we are not saying that there is no workers' compensation coverage unless the injured employee's position was

specifically identified on the employer's application. Moreover, assuming that the policy here allowed for the insurer to use the premium audit process to adjust rates retrospectively -- see note 7, <u>supra</u> -- this may create some additional play in the system. However, in any event, we do not believe the Legislature intended workers' compensation insurers to be required to cover risks posed by undisclosed business enterprises of an entirely different nature from the ones for which coverage had been sought.

Finally, we address Zhang's argument that the administrative judge applied the wrong legal standard. The administrative judge declined the claim for death benefits on the specific ground that the accident "did not arise out of or in the course of the employee's employment with OITC." In this manner, the administrative judge looked to the original, and still-existing, statutory language that covers injuries "arising out of and in the course of [an employee's] employment." G. L. c. 152, § 26. With at least some force, Zhang argues that the relevant test for a travel-related injury is the one set forth in the language that was added in 1927. As noted, the language now covers injuries both "arising out of and in the course of [an employee's] employment," as well as "arising out of an ordinary risk of the street while actually engaged, with [the] employer's authorization, in the business affairs or

undertakings of [the] employer." G. L. c. 152, § 26. See Caron's Case, 351 Mass. at 408 (employee "must show that his injury arose from one of those two sources of injury alternatively stated in the statute" [citation omitted]). The problem with Zhang's argument is that she has not persuasively explained how the 1927 language is more forgiving than the original language with respect to whether the relevant travel was sufficiently related to the work of the employer.[15] Accordingly, even were we to conclude that the administrative judge strictly speaking applied the wrong standard, this would be of no consequence here.[16]

Decision of reviewing board
affirmed.

---

[15] Certainly, the language added in 1927 sought to broaden coverage so as to include injuries that "ar[ose] out of an ordinary risk of the street." However, to demonstrate coverage, the employee still would need to show that while undertaking the travel, he was "actually engaged, with [the] employer's authorization, in the business affairs or undertakings of [the] employer." G. L. c. 152, § 26. On its face, such language would appear to require a connection to the employer's work at least as strong as that required by the original language. Put differently, while the 1927 amendment intended to allow coverage for a greater set of work-related injuries incurred away from the workplace, Zhang has failed to demonstrate that the amendment intended to loosen the test for whether the travel at issue was work related.

[16] We deny Zhang's request for appellate attorney's fees.