Welch, J.
I. Introduction
Plaintiff Modis, Inc., seeks to enforce certain restrictive covenants to which, at one point, their former employees agreed. Modis, Inc. is in the business of providing temporary staffing to various companies who need computer assistance. Modis recruits candidates for short term employment and places them in assignments for certain technical computer positions with various employers. These various employers, such as Bell Atlantic and others, are the clients of Modis. Until the summer of 1999, the individual defendants were employed by Modis. Employees such as Michael Consolazio and Emily Strawn, while employed by Modis, would know of the various corporate client’s employment needs for temporary or permanent technical positions and would match those needs with various contractors (also known as consultants or employee candidates). Put simply, Modis acted as an employment placement service for a certain specialized information technology market.
Defendant Mark Aiello was the manager of the Massachusetts branch of Modis, Inc. located in Burlington, Massachusetts. In March of 1999 he became a Regional Vice-President at Modis whereby he supervised branch offices in Massachusetts and New Hampshire. In July of 1999, Aiello voluntarily resigned from Modis.
In late September of 1999, less than two months after leaving the employ of Modis, Inc., defendant Aiello started up a corporation known as The Revolution Group, LTD. Defendants Michael Consolazio and Emily Strawn also left Modis within weeks of Aiello’s departure and now work with Aiello (their long time boss at Modis) at his company, The Revolution Group. Consolazio and Strawn have business cards representing themselves as agents of The Revolution Group and have passed these out to corporate clients of Modis in an attempt to lure these accounts away. There is no significant dispute that The Revolution Group proposes to be in the exact same business as Modis, Inc.
This case does not involve a covenant not to compete. Instead, it involves certain restrictive covenants entered into between the individual defendants and the predecessor to Modis, a company by the name of Zeitech, Inc. These covenants, in pertinent part, restricted the individual defendants from using any confidential or proprietary information except in their employment with Zeitech. In addition, they restricted *247 the defendants, for a period of time after their employment, from soliciting business from a company which had been a customer of Zeitech. Finally, the restrictive covenants prohibited the individual defendants from employing any employee, consultant, or subcontractor of Zeitech for a period of time after employment termination.
These restrictive covenants were contained in two separate types of documents. First, the restrictive covenants were contained in a document termed “The Professional Practices Agreement” which was incorporated with the Offer Letter of Zeitech when employing each of the individual defendants. Certain portions of the Professional Practices Agreement appear to have been modified either by the Offer Letter itself or by subsequent amendments. The other set of restrictive covenants was contained in the Stock Option Agreement exercised by each of the individual defendants. The substance of the two sets of covenants are essentially the same; it is the time limits of the covenants that differ. In some respects, the restrictions contained in the Stock Option Agreement called for a lengthier period of time and are more restrictive. In other respects they may be considered less restrictive. The issue at this stage of the proceedings is whether this court should enforce, on a preliminary injunctive basis, any or all of these restrictive covenants.
Based upon the extensive evidence (including deposition testimony and exhibits) submitted by both sides, this court makes certain preliminary findings and allows the plaintiffs motion for preliminary injunction in part.[1] For the reasons set forth below, this court finds that the restrictive covenants contained in The Professional Practices Agreement, as amended by Zeitech, are enforceable against the individual defendants. At least at this early stage, this court declines to enforce the restrictive covenants contained in the Stock Option Agreements.
II. Preliminary Factual Findings
Confronted with a motion for preliminary injunction, the court deals with probabilities. For example, has the plaintiff proven a probability of success despite incomplete discovery and an abbreviated opportunity to present evidence? In sifting through the extensive and conflicting testimony and exhibits, a judge must determine what constitutes a showing of a probability of success on the merits. The court is satisfied that the following facts meet this standard.
In 1994, Zeitech, Inc. was a Delaware corporation with the principal place of business in New York, New York. Zeitech, Inc. was in the business of recruiting employee candidates, consultants and contractors to place at assignments for various corporate clients who needed highly skilled individuals to fill temporary and permanent technical positions. Zeitech, Inc. wished to create a Boston-based office.[2] Therefore, on or about February 15, 1994, Zeitech hired defendant Mark Aiello to start Zeitech’s branch office in Boston. Prior to working with Zeitech, Aiello worked for an entity known as AGS Information Services, Inc., a competitor of Zeitech. While employed by AGS, Aiello placed some consultants/candidates with such businesses as Bell Atlantic, Bank Boston and other companies which later were the clients of Zeitech, Inc. In addition, defendants Michael Consolazio and Emily Strawn were employed by AGS Information Services, Inc. prior to their employment with Zeitech.
Mark Aiello signed on as the Zeitech Boston branch manager on February 1, 1994. The Offer Letter specifically references a Professional Practices Agreement which was signed by Aiello three days later. The Professional Practices Agreement prohibited Aiello from using any confidential proprietary information of Zeitech except in the course of his employment with Zeitech. In addition, for a period of 180 days after his termination from Zeitech, he promised not to solicit any business from any company which Aiello solicited business for Zeitech during one year prior to his termination. It was agreed that this provision would be invalidated if Zeitech was sold to another company and the acquiring company did not provide Aiello with at least 90% of his Zeitech compensation. In addition, Aiello promised that for a period of two years after his employment at Zeitech he would not offer employment to or employ directly or indirectly any employee, consultant, subcontractor or other agent of Zeitech who was employed by Zeitech during the one-year period immediately prior to his termination. Aiello claims that certain provisions of The Professional Practices Agreement were orally modified by agreements between him and the president of Zeitech. I do not credit this assertion.
Aiello, in conjunction in starting up the Boston branch of Zeitech, promptly hired his former employment companions, defendants Consolazio and Strawn. Michael Consolazio was employed as a senior account executive at the Zeitech Boston branch and signed his Offer Letter on February 22, 1994. He also signed a nearly identical Professional Practices Agreement. I do credit Consolazio’s assertion the Zeitech entered into a written addendum to this Professional Practices Agreement on March 7, 1997. This addendum amended paragraph 5 of the Professional Practices Agreement and reduced from 2 years to 3 months the period of time after his termination with Zeitech in which he could employ any employee, consultant or subcontractor of Zeitech.
Defendant Emily Strawn was offered a position at the Boston branch of Zeitech as account executive. She signed her Offer Letter on February 18, 1994 (which references the Professional Practices Agreement) and a Professional Practices Agreement was signed early in March. This Professional Practices Agreement was identical to that of Michael Consolazio and was modified in the same fashion.
*248 Although neither the Offer Letter nor the Professional Practices Agreement explicitly stated that these restrictive covenants might be assigned to a new corporation which acquired or merged with Zeitech, it was strongly implied. The Offer Letter signed by all three individual defendants contained an explicit provision that certain provisions of the Professional Practices Agreement would be waived in the event that Zeitech was sold and the employee did not receive at least 90% of his or her Zeitech compensation by the buying company. The letter also stated that certain other aspects of the Professional Practices Agreement would remain in effect if Zeitech was sold.
The three individual defendants were successful in building up the business of Zeitech at its new Boston branch. As the managing director of the Boston office, Mr. Aiello managed employees who were responsible for cultivating business with existing clients, generating new clients, evaluating employee candidates and consultants and matching them with client needs, and managing the business operations of the office. Mr. Aiello was successful in this regard and the Zeitech business grew. As an account executive, defendant Consolazio cultivated business and generated new business with various companies. Part of his job was identifying new business (i.e. new job openings at various corporations) and matching those openings to suitable consultants and contractors (recruited by Zeitech). Although defendant Consolazio (and the other individual defendants) had various business contacts before joining Zeitech, part of each individual defendant’s job was to develop further contacts with various existing clients and develop new clients while matching the clients needs with the manpower available to Zeitech. As Mr. Consolazio testified, to be successful at Zeitech and Modis, he and the other defendants had to develop and strengthen relationships with clients and consultants. This he did for Zeitech and its corporate successors for a period of approximately five years. As defendant Strawn testified at her deposition, her “success very much depended upon [her] relationships with [her] consultants” and clients. Also, as defendant Strawn testified: “I started with nothing. I didn’t have any clients when I started. The branch was just in the process of developing. So I added every client I had I added over time ...”
On December 19, 1995, Zeitech entered into stock option agreements with each of the three individual defendants. The stock option agreements contained similar, albeit different, restrictive covenants governing the raiding of employees or clients upon termination from Zeitech. Apparently realizing that the company was about to be sold, Zeitech accelerated the vesting of these stock options and the defendants became 100% vested in their options on the very next day (i.e. December 20, 1995). Each individual defendant promptly exercised all of his or her options on January 1, 1996. Shortly thereafter, on January 11, 1996, Career Horizons entered into an Asset Purchase Agreement with Zeitech whereby Career Horizons acquired substantially all the assets of Zeitech. Pursuant to this Asset Purchase Agreement, Zeitech assigned to the purchasing entity, among other things, all “employee contracts” and its “arrangements” with its employees. Zeitech retained all its rights, title and interest in its capital stock. The stock options, which, of course, were not the property of Zeitech, were not acquired by Career Horizons. During the due diligence period of this acquisition, Zeitech never provided Career Horizons with a copy of the stock option agreements or any of the restricted covenants contained therein.[3]
Later that year, Career Horizons merged with an entity known as Acu Staff. Acu Staff, in turn, merged with plaintiff Modis in 1997. All three individual defendants continued to be employed in essentially their same capacities (with salary increases and certain promotions) through each of these corporate acquisitions and/or mergers. In July of 1999, all three individual defendants suddenly and voluntarily resigned from employment with Modis. In September of 1999, Mr. Aiello organized a Massachusetts corporation known as The Revolution Group. The Revolution’s telephone number was the telephone number assigned to Mr. Consolazio at Modis just a few months before.[4] The Revolution intends to engage in the same business as Modis and will be a competitor of the Boston branch. All three individuals now possess business cards, which they hand out freely, indicating that they are agents for the new corporation known as The Revolution. Ms. Strawn and Mr. Consolazio expect to be paid by Mr. Aiello and/or The Revolution company in early January of 2000 and become shareholders in the corporation at that time. For all intents and purposes, defendants Strawn and Consolazio are employed by The Revolution company which is owned and operated by Mr. Aiello.
In his or her capacity with The Revolution company, each individual defendant has been active in soliciting various companies who were (at the time of the defendants’ employment with Modis) and currently are clients of Modis. For example, Mr. Consolazio in November and December met with Bell Atlantic managers and Modis consultants who worked at Bell Atlantic and provided them with his new business card for The Revolution. Likewise, in the last two months, Ms. Strawn attempted to recruit several contractors and/or consultants currently employed by Modis. In addition, she has, since her departure from Modis, visited such Modis clients as Bank Boston providing them with her business card and seeking to do business with them as a representative of The Revolution.
HI. Discussion
In order to obtain preliminary injunctive relief, Modis must satisfy the well-known three-part standard: 1) that there be a reasonable likelihood of sue- *249 cess upon the merits; 2) that Modis will suffer irreparable harm if the injunction is not granted; and 3) that the harm Modis will suffer outweighs the injury to the defendants. A former employer may enforce the restrictive covenants executed by an employee when the employer demonstrates that the agreement is necessary to protect the employer’s legitimate business interests and that the covenants are reasonably limited in time and space. The restrictive covenants, however, cannot be enforced to prevent ordinary competition in the market place. Likewise, an employee cannot be restricted from using his or her own skills or knowledge or talents in future employment. Nevertheless, the non-disclosure of confidential or proprietary corporate information and a company’s good-will are legitimate business interests that a company may seek to enforce by an appropriate restrictive covenant or non-competition clause. See New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974); All Stainless Inc. v. Colby, 364 Mass. 773, 778 (1974).
A. Modis acquired certain restrictive covenants.
Of course, before it can be determined whether any restrictive covenant should be enforced, it must be established, at least by a probability of success, that plaintiff Modis has any rights to enforce. In other words, did Modis obtain the rights under the restrictive covenants signed by the individual defendants?
Modis has failed, at least at this point in time, to establish with sufficient probability that it obtained any rights in the restrictive covenants contained within the stock option agreements. At the time of the asset purchase by Career Horizons, the director of finance and administration for Zeitech did not, during her due diligence, provide any of the stock option agreements to Career Horizons. See Affidavit of Denise Whalen. This, along with the fact that the stock option agreements have no explicit or implicit language regarding their assignability, constitutes evidence that Career Horizons (and later Modis which merged with the successor of Career Horizons) did not acquire the restrictive covenants in the stock option agreements. Perhaps, the plaintiff will be able, in the future, to prove that the stock option agreement restrictive covenants were acquired and are binding. Some of the plaintiffs arguments in this regard are rather compelling. For example, the timing of the stock option agreement, which was signed, accelerated and exercised all within the period of time in which Zeitech apparently was negotiating the asset purchase with Career Horizons, is strong evidence that the restrictive covenants would have little value if they were not to be transferred over to the new entity acquiring the employment staffing business of Zeitech. On balance, however, Modis has not sufficiently established that the restrictive covenants contained in the stock option agreements should be enforced by way of a preliminary injunction.
Plaintiff Modis presents significantly stronger evidence regarding its acquisition of the restrictive covenants contained within the Professional Practices Agreements. There is no dispute that Career Horizons explicitly acquired, during the asset purchase, the employment contracts and employment “arrangements” that the individual defendants had with Zeitech. Likewise, those assets became the property of Modis after the merger. The employment contracts included the restrictive covenants. The defendants vigorously argue, however, that, as a matter of law, these employment contracts and the restrictive covenants contained therein are personal service contracts which cannot be assigned to another entity without the consent of the employee. The defendants rely upon some rather well aged Massachusetts authority whereas the plaintiff counters with more recent contrary decisions from a large number of jurisdictions outside of Massachusetts. Compare West v. Jacobs, 277 Mass. 406, 408 (1931), with Adamowicz v. Iwanicki, 286 Mass. 453, 456 (1934). See Norman Ellis Corp. v. Lippus, 176 N.Y.S.2d 5 (N.Y.Sup.Ct. 1955); Abalene Pest Control Service, Inc. v. Hall, 220 A.2d 717, 721 (Vt. 1966). Whether these restrictive covenants constitute a personal service contract is open to question. But this court need not tread down that twisted road. Instead, it is rather easy to conclude that each of the individual defendants fully understood and consented to Modis acquiring the restrictive covenants contained in the Professional Practices Agreement. See New England Cabinet Works v. Morris, 226 Mass. 246, 250 (1917) (personal services contract assignable with consent of parties to original contract). As late as March 30, 1999, defendant Michael Consolazio received a promotion from Modis (increasing his salary) and, in return, he signed a letter agreement. That letter was drafted by none other than defendant Mark Aiello, then the Regional Vice-President of Modis. That letter, drafted by Aiello, refers repeatedly to Modis/Zeitech as a singular employer and sets forth that: “All other terms of your employment with Modis/Zeitech outlined in your offer letter dated February 3, 1994, remain in effect.” That original offer letter of February 3, 1994, incorporated the Professional Practices Agreement and the restrictive covenants contained therein. It was, of course, the Offer Letter written by Zeitech and agreed to when Con-solazio joined Zeitech. A fair reading of the March 30, 1999 promotion letter is that defendant Consolazio fully understood that the restrictive covenants contained in his initial employment agreement with Zeitech remained in full force and effect (aside from the increase in salary and a promotion in position) after the business was acquired by Modis. Needless to say, as Consolazio and all the other individual defendants were handsomely compensated by Modis, the agreement was supported by adequate consideration. *250 Defendant Emily Strawn signed and agreed to a nearly identical promotion letter, written again by Mark Aiello, in the spring of 1999. As a condition for receiving these promotions, both Consolazio and Strawn agreed to Modis acquiring the restrictive covenants that bound these employees while at Zeitech.
The evidence is equally clear that Mark Aiello fully understood that he remained obligated under the Professional Practices Agreement that he has signed with Zeitech. This is demonstrated by Aiello’s repeated efforts to enforce the Zeitech covenants when other individuals left the employ of Modis. For example, in May and June of 1999 defendant Mark Aiello, writing as the Regional Vice-President of Modis, informed a former employee of Modis (a Mr. Aultz) that he was still bound by the “post-termination contractual obligations to Zeitech, Inc.” and insisted that this individual who had left the employ of Modis comply with the terms of the Professional Practices Agreement immediately. Attachments “D” to Affidavit of Marc Mayo. Defendant Aiello plainly understood the importance of these restrictive covenants within Professional Practices Agreement. As he explained in May of 1999 to another former Modis employee, when attempting to compel him to abide by similar restrictive covenants: “Modis has spent significant sums and put significant efforts into building the good-will of its business in client relationships and will not hesitate to seek its legal and equitable remedies in enforcement of these provisions if you choose to ignore them.” See letter of Mark Aiello to Kyle Swist, dated May 17, 1999 (relating to agreement not to solicit Modis clients or hire Modis employees within an eighteen-month period after termination from Modis). Aiello’s repeated references to Modis as a single entity with Zeitech (e.g. referring to “Modis/Zeitech”) and his repeated insistence that the Professional Practices Agreements signed by Zeitech employees were still enforceable when the employee left the employ of Modis, strongly indicate that Aiello fully comprehended and consented to Modis acquiring the restrictive covenants contained within his own Professional Practices Agreement.
B. The restrictive covenants protect legitimate corporate interests.
The restrictive covenants contained within the individual defendants’ Professional Practice Agreements are enforceable. The restrictive covenants here, particularly the non-solicitation and non-raiding provisions, are necessary to protect Modis’ legitimate business interests, particularly its good-will and confidential information. The business of Zeitech, and later Modis, was developing a base of knowledge as to which employers needed technical support help, particularly in information technology, and which consultant or contractors (i.e. temporary employees) were available to fill the specific slots which the corporate clients needed to be filled. This is the essence of this highly specialized temporary staffing industry. This combination of knowledge is confidential information possessed by Modis. In addition, it constitutes the good-will of the company. Here each of the individual defendants, while being compensated by Zeitech and its parent companies (such as Modis), spent a considerable amount of time “gaining and maintaining the good-will of his employer’s customers in a competitive sales environment.” All Stainless Inc. v. Colby, 364 Mass. 773, 776 (1974). The knowledge of an employer’s clients and its consultants, particularly in the recruiting industry, is not the type of general skills that a former employee may take from one job to the next without fear of enforcement of a restrictive covenant.[5] Instead, it is the type of confidential information, to quote Mr. Aiello in his letter to Mr. Swist, “that Modis has spent significant sums and put significant efforts into building the good-will of its business and client relationships ...” This is the type of legitimate business interest which may be enforced by way of a restrictive covenant.
The fact that certain Modis customers are well known corporations does not dimmish the fact that this constitutes confidential information and/or the good-will. It is the relations with the corporate clients that Modis has built up which constitutes the goodwill. Furthermore, it is the knowledge of the availability of certain temporary employees or consultants and the linking of them to specific jobs offered by the corporate clients that constitutes the confidential information.
This is not publicly available information.
C. The covenants are reasonable.
The restrictive covenants in this case are reasonable in all respects, including time and space. This case does not involve the sometimes more burdensome provisions of a non-compete agreement. Instead, the restrictions here are a more narrowly focused non-solicitation and non-raiding covenants. As to defendants Consolazio and Strawn, the applicable provisions of the Professional Practices Agreement, together with the amendments, restrict them for a period of 180 days after their termination of employment from soliciting business with any company, from which that employee solicited business for Zeitech or Modis during one year prior to their termination. This is narrowly drawn in that it restricts solicitation only from companies which the individual did business with and only for the period of one year prior to termination. Furthermore, 180 days is a relatively brief period of time in comparison to other non-competition and similar restrictive covenants. Defendants Consolazio and Strawn are further restricted, for a period of three months after termination of employment from offering employment to any employee, consultant or sub-contractor of Modis. Again, this is a narrowly drawn restrictive covenant.
The restrictive covenants applied to defendant Aiello are somewhat broader given the fact that he did *251 not sign an amendment to the Professional Practices Agreement and that his responsibilities as branch manager enlarged the stable of clients and employees with whom he did business. Still, the restrictive covenants are reasonable. Aiello is restricted for 180 days, again a relatively short period of time, from soliciting business from any corporate client of Modis with which his branch did business within a year of his termination. Given the competitive nature of the recruiting industry and the large number of potential corporate clients looking for temporary staffing, this does not restrict Aiello significantly. In addition, Aiello is restricted for a period of two years after his termination of employment at Modis from offering employment directly or indirectly to any Modis employee, subcontractor or consultant who was employed by Modis during one year immediately prior to his termination. In the context of similar restrictive covenants, a two year period has not been held to be unduly restrictive. This is particularly true of an anti-raiding provision. After all, Mr. Aiello could hire any other person to work for his new company as long as they were not employed by Modis within the last year. This does not restrict Mr. Aiello unduly. See Bowne of Boston v. Levine, 7 Mass. L. Rptr. 685, Sup.Ct. of Massachusetts (November 25, 1997) (Burns, J.) (enforcing a two-year anti-raiding provision).
The reasonableness of these provisions is underlined by the fact that each of the individual employees is still able to compete against their former employer immediately. They are in no way being forced out of their chosen line of work. Indeed, Mr. Consolazio and Ms. Strawn testified in their depositions that they had various employment opportunities other than working with The Revolution. The only things that the individual defendants cannot do, and that only for a limited time, is to solicit business from recent Modis clients or to employ or place individuals who have recently been employed by or placed by Modis. Modis has further agreed that the restrictive covenants should be enforced only as to employees or consultants to the New England branch of Modis (as opposed to Modis’ operations nationwide) and to corporate clients of Modis developed or serviced by the New England branch formerly headed up by Mr. Aiello.
These restrictive covenants do not violate any public interest and are fully in accord with public policy. See eg. Marine Contractors Co., 365 Mass. at 288-89.
C. Irreparable harm has been established and the equities favor the plaintiff.
The plaintiff has also demonstrated that the enforcement of the restrictive covenants are necessary to prevent irreparable harm. The plaintiff has established that, for approximately the past two months, the individual defendants have been actively soliciting both corporate clients and former Zeitech/Modis employees and consultants. Thus, there already may have been a loss of good-will and a misuse of confidential information. In any event, there is a very strong potential for future loss of good-will and confidential information. These interests are very difficult to quantify and are appropriately enforced by means of equitable relief. See All Stainless, supra. Given that the plaintiff has agreed to limit the Professional Practices Agreement to only clients, employees and consultants relating to the New England branch of Modis, this makes the restrictive covenants all the more reasonable and strikes the balance all the more in favor of the plaintiff. Thus, the preliminary injunction should issue. See Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310, 312 (1982).
The individual defendants’ actions since leaving the employ of Modis constitute blatant violations of the Professional Practices Agreement. These violations began soon after the individual defendants left the employ of Modis. In order to adequately protect Modis and provide Modis the benefit of its bargain, the relatively short time limits contained in the restrictive covenants must be deemed to start upon the issuance of this preliminary injunction. Otherwise, the individual defendants will be rewarded for their earlier breaches of the Professional Practices Agreement. For example, the three-month time period contained in the Consolazio and Strawn Professional Practices Agreement has expired, as has a significant portion of the 180-day period. Therefore, the time periods will run as of the date of this preliminary injunction.
An appropriate order will issue.

Counsel for both sides are to be complimented for the professional manner in which they handled the burdensome discovery and briefing of this matter. The discovery was conducted on an expedited basis. This included numerous depositions and a review of extensive documents. The briefs from both sides are models of clarity. All parties have received excellent representation.

The office was actually located in the Boston suburbs.

In the interests of clarity and conservation, this is a simplified version of the corporate acquisition. Various corporations were formed to accomplish this result. After the dust had settled from this transaction, ZT Contingency Corp. held the stock of “old Zeitech” and a new Zeitech, Inc. became a wholly owned subsidiary of Career Horizons and (later) of Modis.

This phone number had been assigned to Modis but was released, apparently by Aiello, shortly before he resigned from Modis. There is circumstantial evidence that the defendants misappropriated this phone number.

Certain things learned by the individual defendants while employed by Zeitech and its successors, such as sales techniques, profit margins, and mark-ups, appear to be the type of general skills or knowledge that an individual legitimately could continue to use in a competing business.