# United States Court of Appeals
## For the First Circuit

No. 04-2429

ANTONIO C. BRAGA and DEBRA BRAGA,

Plaintiffs, Appellants,

v.

GENLYTE GROUP, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Stahl, Senior Circuit Judge,

Lipez, Circuit Judge,

and Oberdorfer,[*] Senior District Judge.

Brian Cunha, with whom Brian Cunha & Associates, P.C. were on brief, for appellants.
Timothy P. Van Dyck, with whom Brian H. Lamkin and Edwards & Angell, LLP, were on brief for appellee.

August 25, 2005

---

[*]    Of the District of the District of Columbia, sitting by designation.

**OBERDORFER**, <u>Senior District Judge</u>.  This case tests the line between the workers' compensation rights of an employee injured on a job in Massachusetts and the immunity from tort suit provided to the injured employee's employer by the same Massachusetts workers' compensation law that benefitted the injured employee, where the employer has participated in a series of mergers during which the employee's job status remained unaffected.  On the unique and relatively complex facts here, we find and conclude that this plaintiff's tort claim is barred by the Massachusetts workers' compensation law, pursuant to which one of defendant's merger successors has previously compensated plaintiff.

Plaintiff-appellant Antonio Braga ("Braga") received workers' compensation benefits for an injury he sustained while an employee of Genlyte-Thomas Group, LLC ("Genlyte-Thomas").  He and his wife are suing in tort for that same injury Genlyte Group, Inc. ("Genlyte").  Braga had worked as an employee of Genlyte before it contributed substantially all of its assets (along with those contributed by Thomas Industries, Inc.) to create Genlyte-Thomas.  The Bragas claim that defects in a hydraulic press Braga was operating while working for Genlyte-Thomas before that merger caused his injury.  The Bragas base their claims against Genlyte on its status as successor, by merger, to Lightolier Incorporated ("Lightolier"); it had owned the allegedly defective press when it

merged with Braga's then-employer. The Bragas claim that Lightolier knew the press was defective at the time of its merger, but that it did not disclose or remedy the defects.

The Bragas allege that this knowledge of the defect created inchoate liability for Lightolier that carried over in the merger, giving the Bragas a cause of action against Genlyte. Genlyte argues essentially that any liability was satisfied, and any tort claims barred, by Massachusetts workers' compensation law – the privileges and immunities of which also carried forward in the merger. The Bragas counter that those immunities do not apply here because their tort claims, based on Lightolier's conduct, arose independently from Genlyte's workers' compensation obligations.

This is the second time this case has come up on appeal. The district court initially dismissed the Bragas' claims as barred by workers' compensation in a one-sentence order that cited no Massachusetts law. Finding that the case presented a "complex and fact-bound" question of state law, a previous panel of this court reversed and remanded for "analysis of a more fully developed factual scenario under Massachusetts law." Braga v. Genlyte, Inc., 57 Fed. Appx. 451, 454 (1st Cir. 2003) (unpublished) ("Braga I"). On remand, the district court granted summary judgment for Genlyte, again holding that "plaintiffs' claims are barred by workers' compensation."

The Bragas contend that the changes in Braga's employer's corporate structure over time relieve him of the barrier to tort claims generally applicable to those enjoying the benefits of workers' compensation. Genlyte argues that its workers' compensation tort immunity survived the mergers. The key question is whether, but for the mergers, Lightolier would have been liable to the Bragas. We hold that it would not have been. Accordingly, we conclude that the workers' compensation barrier was not lifted by the transactions involved here and we affirm summary judgment in favor of the defendant, albeit on a theory different from that employed by the court below.

## I. BACKGROUND

On November 18, 1998, Braga was injured while operating a hydraulic press (the "Press") at a Genlyte-Thomas manufacturing facility in Fall River, Massachusetts (the "Fall River facility"). The Press became activated while Braga was trying to remove a piece of metal jammed in it. It slammed down on Braga's hand, causing severe and permanent damage. He alleges that the Press was defective in that it lacked adequate guards to prevent an operator from unintentionally activating it, and that this defect caused his accident.

## A. Corporate History

In January 1980, Braga began working as a press operator at the Fall River facility for Aluminum Processing Corporation

("APC"). APC, a wholly-owned subsidiary of Lightolier, operated the Fall River facility at that time.

In September, 1980, Lightolier purchased the Press, second-hand, for use in its manufacturing facility in Norwich, Connecticut (the "Norwich facility").

On Friday, January 15, 1982, APC (along with all then-existing subsidiaries of Lightolier) merged into Lightolier. Three days later, on Monday, January 18, 1982, Lightolier merged into BZ Holdings Corporation ("BZ Holdings"), a wholly-owned subsidiary of BZ Acquisition Corporation ("BZ Acquisition"). That same day, BZ Holdings changed its name to "Lightolier Incorporated."[1] Braga's employment status continued unchanged, save that his employer was now Lightolier/BZ rather than APC.

In 1985, BZ Acquisition, which owned Lightolier/BZ, merged into Genlyte. Lightolier/BZ thus became a wholly-owned subsidiary of Genlyte.

In January 1991, Lightolier/BZ merged into Genlyte. Genlyte continued to operate the former Lightolier/BZ business under the name "Lightolier." Braga's employment again continued unchanged, save that his employer was now Genlyte.

---

[1] To distinguish among the various Lightolier entities, we refer only to the original, pre-January 15, 1982, company as "Lightolier." We refer to the corporation that existed from January 15-18, 1982, as "Lightolier/APC," and to the post-January 18, 1982, entity as "Lightolier/BZ."

Around this time, the Norwich facility was converted from manufacturing to warehousing use. In June 1991, Genlyte transferred the Press from its Norwich facility to its Fall River facility, where Braga worked.

On April 28, 1998, Genlyte and Thomas Industries each contributed substantially all of its corporate assets to create a new entity, Genlyte-Thomas. Genlyte became the majority owner of Genlyte-Thomas and Thomas became the minority owner. Genlyte-Thomas continued to do business under the "Lightolier" name. Braga's employment again continued unchanged, save that his employer was now Genlyte-Thomas. Braga was still an employee of Genlyte-Thomas when his accident occurred on November 18, 1998.

After that accident, the Occupational Safety and Health Administration inspected the Press and cited Genlyte-Thomas for a violation because the "operating buttons of the [Press] were not adequately guarded to prevent unintentional operation."

B.      Litigation History

The Bragas first filed a "Complaint for Discovery" against Lightolier in state court in 1999. That complaint was dismissed without prejudice after some discovery.

The Bragas next filed a substantive suit against Lightolier in state court on September 6, 2001. After the case was removed to federal court on diversity grounds, plaintiffs amended

the complaint to name Genlyte, one of Lightolier's successors by merger, as the defendant.

On November 21, 2001, Genlyte moved to dismiss the complaint for failure to state a claim on the ground that it was barred by the workers' compensation law. On January 4, 2002, the district court granted that motion to dismiss in a one-sentence endorsement on the face of the motion: "Allowed, as Lightolier, Inc. would also be an employer for this purpose. Herbolsheimer v. SMS Holding Co., 608 N.W.2d 487 (Mich[. Ct. App.] 2000)." The Bragas appealed.

On February 13, 2003, a panel of this court reversed and remanded for further proceedings. The court was "reluctant to affirm an order of dismissal where the district court neglected to analyze the questions raised by the complaint under the law governing the case," that is, Massachusetts state law. Braga I, 57 Fed. Appx. at 454. The court noted that the Supreme Judicial Court of Massachusetts had addressed the "questions raised by the intersection of the immunity of an employer under the workers' compensation scheme and successor liability" in Gurry v. Cumberland Farms, 550 N.E.2d 127 (Mass. 1990), which should be "central" to the analysis of this issue. Braga I, 57 Fed. Appx. at 454.

On remand, following limited discovery, plaintiffs filed an amended complaint. The Bragas asserted claims of negligence based on "(Old) 'Lightolier' . . . negligently transferring by

-7-

means of the merger, to BZ Holdings/(New) 'Lightolier' the defective [Press]" and of breach of the implied warranty of merchantability. His wife asserted a claim of loss of consortium.

On February 13, 2004, Genlyte moved for summary judgment on the basis of an Agreed Statement of Undisputed Facts.

On October 5, 2004, the district court granted that motion and again dismissed the plaintiffs' claims. The district court's analysis centered, as directed, on Gurry. The district court noted that Gurry permitted a suit in tort to proceed against an employer as successor of a corporation that "was never decedent's employer and would have been susceptible to a third-party claim outside of the workers' compensation protection." On the other hand, the court recognized that, in Gurry, claims based on the conduct of a predecessor that had employed Gurry "failed because 'all [the] acts and omissions alleged against [it] arose out of the direct employment relationship.'" (Citing Gurry, 550 N.E.2d at 131.) The district court framed the dispositive question as whether Braga had been "an employee of Lightolier, the allegedly negligent predecessor corporation." The court focused on whether Braga was employed by Lightolier/APC from its creation on Friday, January 15, 1982, through its merger with BZ Holdings three days later, on Monday, January 18, 1982. The district court held that Braga's having "performed no work over the weekend is irrelevant to his employment status." Because Braga's employment was never

terminated, it was "clear that [Lightolier/APC] did employ him, although it only had a brief existence." Based on this reasoning, the district court concluded that plaintiffs' claims were barred by the workers' compensation statute.

## II.  DISCUSSION

We review the district court's grant of summary judgment de novo.  Burke v. Town of Walpole, 405 F.3d 66, 75 (1st Cir. 2005).  Like the lower court, we are to "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor."  Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 45 (1st Cir. 2003).  Summary judgment is proper only if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)).  We are not bound by the district court's rationale, but may affirm its grant of summary judgment "on any ground supported by the record." Cimon v. Gaffney, 401 F.3d 1, 4 (1st Cir. 2005).

## A.        The Massachusetts Workers' Compensation Scheme

The Massachusetts workers' compensation statute generally provides the exclusive remedy for employees who suffer work-related injuries.  Mass. Gen. Laws ch. 152, § 24.  A non-employer third party tortfeasor, however, is not protected by the immunity from suit by an injured worker that workers' compensation law affords that worker's employer.  Mass. Gen. Laws ch. 152, § 15.  Injured

-9-

employees are thus free to sue third party tortfeasors whose negligence caused or contributed to their work-place injuries.

Where a third party whose actions might subject it to a tort suit by an injured worker later merges with the injured worker's employer – so that the employer and the "third party" become one and the same – a dilemma arises. After a merger, the surviving corporation is "liable for[] all liabilities and obligations of each of the constituent corporations in the same manner and to the same extent as if such . . . surviving corporation had itself incurred such liabilities or obligations." Mass. Gen. Laws ch. 156B, § 80(b). As successor to the alleged tortfeasor, the surviving entity should ordinarily be subject to suit by the injured employee to the same extent the third party would have been absent the merger. On the other hand, under the circumstances here, neither the plaintiffs, nor the state decisions on which they rely, explain to our satisfaction why the injured employee's employer is not immunized from tort liability by the same law that provided compensation administratively to the injured employees. See, e.g., infra Part II.D.3.

**B.        The Dual Persona Doctrine**

The Bragas claim that they should be able to sue Genlyte as successor to the original Lightolier despite the otherwise applicable workers' compensation immunity. They rely on what is commonly referred to as the "dual persona" doctrine. According to

-10-

that concept an "employer may become a third person, vulnerable to tort suit by an employee, if – and only if – it possesses a second persona so completely independent from and unrelated to its status as employer that by established standards the law recognizes that persona as a separate legal person." 6 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 113.01[1], at 113-2 (2005) ("Larson"); see also Gurry, 550 N.E.2d at 131 (citing this definition from an earlier edition of the Larson treatise). Where such a "dual persona" exists, the dual persona doctrine may permit a tort suit only if the "nonemployer persona" owed the injured employee duties "totally separate from and unrelated to" duties arising out of the employment relationship. Larson, § 113.01[4], at 113-10 (emphasis in original).

Gurry is the leading Massachusetts case on the "dual persona" doctrine. The facts in Gurry, as here, are somewhat involved. Gurry worked for United Cranberry Growers Associates, Inc. ("Cranberry"), a wholly-owned subsidiary of Delaware Food Store, Inc. ("DFS"). Cumberland Farms Dairy, Inc. ("Dairy"), another DFS subsidiary, sold managerial services to Cranberry. As part of these duties, Dairy designed, and commissioned a contractor to build, buggies for Cranberry. The next year, Cranberry and Dairy merged into DFS, which in turn merged into Cumberland Farms, Inc. ("Cumberland"). Gurry continued at his job, with Cumberland becoming his employer as a result of the mergers. Gurry was killed

-11-

while working for Cumberland, operating one of the buggies. Gurry's beneficiaries received workers' compensation payments. The Gurry plaintiffs nonetheless sued Cumberland, alleging that negligent design, manufacture and maintenance of the buggy by its predecessors, Cranberry and Dairy, caused Gurry's death.

The question thus presented was one of first impression in Massachusetts: could an employee injured on the job sue an employer for negligence on the part of the employer's corporate predecessors? The Supreme Judicial Court found that the "answer depends on the interrelationship of two statutes: the business corporation law and the workers' compensation act." Gurry, 550 N.E.2d at 130 (citations omitted). The Gurry court observed that, under Massachusetts business corporation law, "Cumberland stood in the shoes of Cranberry [] and Dairy . . . , inheriting any liabilities for tortious conduct, as well as any privileges in the form of statutory immunities, that those predecessors would have had." Id. at 131 (citing Mass. Gen. Laws ch. 156B § 80(a)).

The court held that Cumberland could not be sued for Cranberry's alleged negligence because Cranberry itself "would have been immune from suit since all the acts and omissions alleged against [it] arose out of the direct employment relationship" between it and Gurry. Id. On the other hand, "Dairy was never Kevin Gurry's employer, and would have been susceptible to a third-party claim as a tortfeasor outside of the protection of workers'

-12-

compensation" if not for the merger.  Id. (citing Mass. Gen. Laws ch. 152 § 15 (1988 ed.)).  Had the merger not occurred, plaintiffs would have been able to bring a third party suit against Dairy, the company that designed and supervised the manufacture of defective equipment for the decedent's then-employer, Cranberry.  The Gurry court emphasized that "the workers' compensation statute was intended to deal with injuries and liability occurring in the course of the employer-employee relationship."  Id.  Since a claim based on Dairy's conduct did not arise from an employment relationship, but "from the negligence of an independent corporation," allowing it to go forward would not interfere with the purpose of the workers' compensation statute.   The court concluded that "insulat[ing] Cumberland from liability it acquired, as a result of its merger with Dairy[,] because [Cumberland] happened to be Kevin Gurry's employer, would subvert the important aims of both the workers' compensation system and the business corporation statute."  Id.

## C.      Braga's Employment Status

The district court held that workers' compensation bars this suit because Braga was employed by Lightolier/APC during its "brief existence."  Braga's employment status during the three-day period from January 15-18, 1982 is the primary issue the parties address on appeal.

Plaintiffs argue that this question cannot be resolved as a matter of law but requires a detailed, fact-specific inquiry into the relationship between Braga and Lightolier/APC. As explained below, we disagree.

Massachusetts business corporation law provides that "all of the estate, property, rights, privileges, powers and franchises of the constituent corporations" automatically vest in the surviving corporation upon merger "without further act or deed." Mass. Gen. Laws ch. 156B, § 80(a)(5). Despite the Bragas' hyperbolic claim that treating employees as assets that transfer by law upon merger means viewing them as "chattels of the corporation," a corporation's employment contracts are counted among its assets. See, e.g., Modis, Inc. v. Revolution Group, Ltd., 11 Mass. L. Rptr. 246, 1999 WL 1441918, at *6 (Mass. Super. Ct. Dec. 29, 1999) (describing "employment contracts and employment 'arrangements'" as "assets [that] became the property of [the surviving corporation] after the merger"); cf. Dickson v. Riverside Iron Works, Inc., 372 N.E.2d 1302, 1304-05 (Mass. App. Ct. 1978) (plaintiff may enforce employment contract against surviving corporation after merger).

The Bragas argue that employees do not automatically continue working for a surviving corporation after a merger but must establish employment relationships anew with that entity. Cf. Holliday v. Pers. Prods. Co., 939 F. Supp. 402, 405-07 (E.D. Pa.

-14-

1996) (rejecting argument that workers' compensation immunity would not apply after employer's merger with third party tortfeasor unless employee consented to be employed by new corporate entity). If that were the law, employees of merging corporations would lose their jobs instantaneously upon a merger, absent some affirmative conduct showing that they now worked for the surviving corporation. Similarly, the employment status of those in otherwise identical positions would vary with their awareness of, and view toward, changes in corporate status that did not affect the conduct of their jobs in any way. None of the cases plaintiffs cite, however, supports such odd results. See, e.g., Langevin's Case, 91 N.E.2d 920, 921 (Mass. 1950); Abbott v. Link-Belt Co., 88 N.E.2d 551, 554 (Mass. 1949). Indeed, none even addresses the relevant question, namely, how a merger affects continuity of employment. We see no basis for holding that there was a gap in Braga's employment during the January 15-18, 1982, period. He simply continued as an employee of the corporate entity that succeeded his employer, first Lightolier/APC, then Lightolier/BZ.

However, the question of whether Lightolier/APC employed Braga is not dispositive, but merely a red herring here. This can be seen by moving the analysis back one level, thus framing it in terms of the initial merger of Lightolier and APC (Braga's original employer) rather than the merger of Lightolier/APC and BZ Holdings three days later. Whether or not Lightolier/APC employed Braga

-15-

during its three-day existence, Lightolier – which it succeeded – unquestionably never employed him.  Since Lightolier owned the allegedly defective Press when it merged with Braga's then-employer, APC, Lightolier's merger with APC appears to raise the same liability issues that the Bragas claim are raised by Lightolier/APC's merger with BZ Holdings.  But the mere fact that Lightolier did not employ Braga would not establish successorship liability.  Lightolier/APC can inherit Lightolier's third-party liability only if such liability would have existed absent the merger.  The plaintiffs in <u>Gurry</u> were able to sue the decedent's employer not merely because its predecessor, Dairy, had not employed him, but because Dairy "<u>would have been susceptible to a third-party claim</u> as a tortfeasor outside of the protection of workers' compensation" if not for the merger.  550 N.E.2d at 131 (emphasis added).

The foregoing considered, the question we must answer is whether Lightolier "would have been susceptible to a third-party claim" but for the merger.  If so, Genlyte may be sued.  If not, it may not.

**D.      Could the Bragas Have Brought a Third Party Claim Against Lightolier?**

Although <u>Gurry</u> provides the question, it does not provide the answer.  While the Supreme Judicial Court of Massachusetts "alluded favorably to the [dual persona] theory" in <u>Gurry</u>, it has "never explicitly adopted" it, much less established its scope or

-16-

set parameters for it. Barrett v. Rodgers, 562 N.E.2d 480, 482 (Mass. 1990). No Massachusetts court has considered whether Gurry should be extended to circumstances like these, where an employer's predecessor merely owned defective equipment when it merged with the employer and an employee was later injured by that equipment.

### 1. Preliminary Issues on Applying Massachusetts Law

A federal court that faces an unresolved state law question is to "'ascertain the rule the state court would most likely follow under the circumstances.'" Braga I, 57 Fed. Appx. at 453 (quoting Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996)). It is reasonable to "assume that the state court will follow the rule that appears best to effectuate relevant policies." Moores v. Greenberg, 834 F.2d 1105, 1107 (1st Cir. 1987) (internal quotation and modification omitted). "We may seek guidance 'in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law.'" Braga I, 57 Fed. Appx. at 453 (quoting Blinzler, 81 F.3d at 1151). In so doing, "we must exercise considerable caution when considering the adoption of a new application" of state law that could "expand [its] present reach." Doyle v. Hasbro, Inc., 103 F.3d 186, 192 (1st Cir. 1996). A federal court sitting in diversity must "take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the

-17-

province of state courts." Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996).

Extrapolating from analogous decisions in sister states and policy pronouncements of Massachusetts courts, we conclude that Gurry should not be extended to permit suit here.

### 2.    Relevant Massachusetts Policy

The Supreme Judicial Court of Massachusetts has described the "very broad" exclusivity provision of the workers' compensation scheme as its "cornerstone." Berger v. H.P. Hood, Inc., 624 N.E.2d 947, 949 (Mass. 1993). It has also cautioned courts against creating "[a]ny change in compensation law which would permit a covered employee to recover compensation benefits and, in addition, permit litigation by the employee against his employer to recover for an injury clearly covered by the Workmen's Compensation Act." Longever v. Revere Copper & Brass Inc., 408 N.E.2d 857, 860 (Mass. 1980). "The instances in which a single legal entity . . . will be liable under both the workers' compensation scheme and in a lawsuit for a single injury arising out of a single workplace incident are very rare." Barrett, 562 N.E.2d at 483.

### 3.    Analogous Decisions from our Sister States

With this Massachusetts background in mind, we turn to analogous decisions of our sister states. Any exception to the immunity that workers' compensation schemes provide employers "must be narrowly construed to fit only the policy reasons that give rise

-18-

to its inception, and not allowed to expand to envelop situations that [workers' compensation] was otherwise intended to cover." Herbolsheimer v. SMS Holding Co., 608 N.W.2d 487, 495 (Mich. Ct. App. 2000); see id. ("dual-persona doctrine should be interpreted more narrowly rather than more broadly" where its scope is unclear). It is important that the dual persona doctrine "not be used for the purpose of simply evading the exclusivity provision of the Workmen's Compensation Act." Kimzey v. Interpace Corp., 694 P.2d 907, 912 (Kan. Ct. App. 1985); cf. Gurry, 550 N.E.2d at 131 (evaluating how suit would affect "important aims" of workers' compensation and corporate successorship principles).

The majority – and, we conclude, better-reasoned – view among courts that have considered circumstances akin to those here is that an employer cannot be held liable on the basis of a predecessor's mere ownership of defective equipment when it merged with the employer. See Corr v. Willamette Indus., Inc., 713 P.2d 92, 96 (Wash. 1986) ("No obligation or liability would have existed prior to the merger, and none should be created by the merger that could not have existed independently."); Vega v. Standard Mach. Co., 675 A.2d 1194, 1197-98 (N.J. Super. Ct. App. Div. 1996) (predecessor's ownership of defective machine at merger did not create liability, when merger did not render predecessor a "seller" or "supplier" and consequently predecessor had no duty to warn). The key question is whether the employer had a separate duty to the

employee-claimant outside of the employment relationship.  See Hatch v. Lido Co. of New Eng., 609 A.2d 1155, 1157 (Me. 1992) (predecessor's negligent pre-merger installation or maintenance of equipment in its own facility for its own use did not implicate a "separate and unrelated duty" for the post-merger entity, beyond that of an employer to its own employees); Herbolsheimer, 608 N.W.2d at 496-97 (question of liability hinged on whether predecessor had "separate obligations" to claimant).

The flaws in plaintiffs' approach are clearer when considering the continuity of the corporate entities.  Plaintiffs are arguing in effect that, on the one hand, Genlyte-Thomas is a continuation of Lightolier/APC for the purpose of holding the successor corporation liable.  On the other hand, plaintiffs argue that Lightolier/APC is so distinct and separate from its successors that its "transfer" of the Press via merger created new duties and liabilities.  The latter view is inconsistent not only with the former, but with the very nature of a corporate merger:  "[T]he consolidation of two or more corporations is like the uniting of two or more rivers, neither stream is annihilated, but all continue in existence.  A new river is formed, but it is a river composed of the old rivers, which still exist, though in a different form." Atlantic & B. Ry. v. Johnson, 56 S.E. 482, 484 (Ga. 1907) (quoting Thompson on Corporations § 8341).  "The object of the consolidation of two or more solvent corporations into one is not usually to wind

up the business of the old corporations but to continue as a unit that which theretofore had been separate." Proprietors of Locks & Canals on Merrimack River v. Boston & M.R.R., 139 N.E. 839, 841 (Mass. 1923). It is the continuity of the constituent corporations that plaintiffs apparently fail to grasp in theorizing that the transfer of equipment through a merger can itself create third party liability. Where the "transferor [] and transferee [] bec[o]me one and the same as of the moment of transfer," there is "[i]n effect, . . . no transfer (and therefore no duty owed) from one entity to another, since at the moment of transfer there was only one entity, the surviving corporation." Duvon v. Rockwell Int'l, 807 P.2d 876, 881 (Wash. 1991) (describing rationale of Corr).

Although the cases discussed above represent the majority view, the states have not taken a uniform approach to the present factual scenario. Plaintiffs rely heavily on Billy v. Consol. Mach. Tool Corp., 412 N.E.2d 934 (N.Y. 1980), in which the New York Court of Appeals permitted suit to go forward against an employer based on its status as successor to corporations that had designed and manufactured allegedly defective equipment for their own use.[2] The equipment passed to the successor corporation through a series of mergers. The court held that, but for the merger, plaintiff

---

[2] As plaintiffs point out, Gurry cites Billy favorably. However, it does so only in general terms that sheds no light on the instant dispute. Gurry, 550 N.E.2d at 131.

-21-

could have sued the predecessor corporations based on their design and manufacture of the defective equipment. The court concluded that this potential liability survived the merger, "since the obligation upon which [the successor] is being sued arose not out of the employment relation, but rather out of [the] independent business transaction" of the merger itself. Id. at 940; see also Schweiner v. Hartford Accident & Indem. Co., 354 N.W.2d 767, 772-73 (Wis. 1984) (holding that, but for merger, plaintiff could have sued predecessor that manufactured defective equipment as third party, but not analyzing basis for such a suit).

A strong dissent in Billy exposed the flaws in the majority's reasoning. The dissent noted that the inchoate tort liability the predecessor incurred after installation of the defective equipment for its own use was "to anyone injured by the defect other than an employee, as to whom [workers'] compensation law immunized it from common-law liability." Billy, 412 N.E.2d at 942 (Meyer, J., dissenting) (emphasis in original). The Billy dissent reasoned that the successor company inherited the predecessor's immunity from liability, including immunity from an employee's suit. As a result, the merger provided no basis for liability; it was not the equivalent of a sale or transfer of assets (with the concomitant legal obligations this would entail), and the act of merging itself did not, as a matter of law, create liability. Id. at 942-44; see id. at 942 ("[E]ven under the most

-22-

liberal application of the [dual persona] doctrine a manufacturer-employer is held protected by compensation immunity when the product was manufactured solely for his own use and not for distribution to the general public.").

## III. CONCLUSION

We are persuaded that the Supreme Judicial Court of Massachusetts would adopt the reasoning of those courts that have declined to extend the dual persona theory to circumstances like those here.  Lightolier purchased the Press for its own use.  It did not sell the Press or allow non-employees to use it.  (It is not even alleged to have modified the Press.)  In the hypothetical world in which no merger occurred, the Press could have caused an injury for which plaintiff would have received workers' compensation only if he worked for Lightolier.  See supra Part II.A.  In such a case, plaintiff would obviously have no third-party claim.  It is the merger itself on which plaintiff relies to stake his present claim.  Allowing a merger to increase, rather than preserve, inchoate liability is not consistent with the policy of the workers' compensation act or the law of corporate successorship.  We are reluctant to expand the dual persona theory to any application beyond that which Massachusetts has already approved, particularly since the policy reasons on which the Gurry court relied are not implicated here.  We are even more reluctant

-23-

where, as here, the better reasoned cases from other jurisdictions hold that such an expansion would not be warranted.

For the foregoing reasons, the district court's decision is AFFIRMED.